## CITY OF SAN ANTONIO et al. v. McKENZIE CONST. CO.

### No. 9510.

Court of Civil Appeals of Texas. San Antonio.

Oct. 30, 1935.

Rehearing Denied Dec. 4, 1935.

T. D. Cobbs, Jr., and Templeton, Brooks, Napier & Brown, all of San Antonio, and Boone, Henderson, Boone & Davis and B. D. Tarlton, all of Corpus Christi, for appellants.

Dodson & Ezell, of San Antonio, and Kleberg & Eckhardt and H. R. Sutherland, all of Corpus Christi, for appellee.

MURRAY, Justice.

On a former appeal of this case, found in 50 S.W.(2d) · 349, this court reversed and remanded the cause for a new trial. The first appeal was by the McKenzie Construction Company from a judgment in the trial court that it take nothing against the city of San Antonio. That judgment was rendered upon an instructed verdict by the trial judge, on the theory that the contract sued on by the McKenzie Construction Company was void and not binding on the city of San Antonio.

The present appeal is presented by the city of San Antonio and certain of its officers, as appellants, from a judgment of the trial court allowing the appellee, McKenzie Construction Company, a recovery against the city in the sum of $82,157.08, with interest at the rate of 8 per cent. per annum from February 24, 1927, until paid. The judgment, also, authorized the issuance of a mandamus.

The McKenzie Construction Company, appellee here and plaintiff below, brought · this suit upon an alleged expressed contract in writing between it and the city of San Antonio for the construction of what is now generally known as the "Olmos Creek Detention Dam." Appellee alleged that it was due large sums of money as a result of work performed and material furnished by it under the terms of this supposed contract.

The cause was submitted upon special issues to a jury, and, upon motion of appellee, judgment was entered for appellee, as above stated.

Appellants, by division III of their brief, attack the validity of the supposed contract on several grounds. Their first attack is upon the validity of the ordinance accepting the "McKenzie Proposal." Their second attack is upon the failure of the board of commissioners to approve the bond furnished by appellee for the faithful performance of the contract. Both of these points were decided, on the first appeal, against appellants, and will not be reopened here.

Appellants' third attack relates to an interlineation made in the proposed contract before it was signed by the proper parties, which it is contended rendered the contract invalid and of no effect. This point was not decided on the former appeal and will here be discussed.

We wish to here copy a part of what was said on the motion for rehearing in the former opinion (50 S.W. (2d) 349, 353): "The contract and bond were executed upon printed forms prepared by the city, which forms, together with the 'Notice to Contractors,' 'Instructions to Bidders,' 'General Conditions of the Agreement,' and 'Specifications,' all also printed and furnished by the city and bound in pamphlet form comprising thirty-three consecutively numbered pages, was furnished by city to all bidders, it being provided in the 'Instructions to Bidders' that all

these documents constituted a part of the contract. The second paragraph of the 'Notice to Contractors' provides that the bidder must furnish suitable guaranty that he will enter into the contract and execute bond and guaranty 'on the forms provided.' Appellant complied with these instructions as to the submission of his proposal and upon the acceptance thereof by the city commissioners, as noted in our original opinion, their discretion in the matter was exhausted. There remained nothing to be done except to fill in the few blanks from data appearing in the accepted proposal and for the parties to affix their signatures to the contract provided by the city. The words used in the ordinance accepting the proposal 'subject to proper and sufficient contract' can only, under the circumstances, be taken to mean and refer to the printed form of contract which the city had furnished and stipulated that the successful bidder must execute."

■ It is clear from the above quotation that this court presumed, on the former appeal, that the contract which was executed between A. J. McKenzie, acting for McKenzie Construction Company, and Mayor Tobin was upon the exact form authorized to be executed by the ordinance passed by the board of city commissioners on July 28, 1925, while the present record shows quite to the contrary. A material interlineation was made in the proposed contract after the ordinance was passed authorizing the execution of the proposed contract, but before the interlined contract was executed by the mayor and appellee, on August 7, 1925. Thus, it is seen that the minds of the real parties to the contract did not meet. That is to say, there was never a meeting of the minds of the board of city commissioners and the McKenzie Construction Company, because the board of commissioners authorized one contract by their ordinance and appellee executed another and different contract.

This interlineation was made in the following manner: After the city had advertised for competitive bids and after the McKenzie proposition had been accepted by ordinance, there was a conference between A. J. McKenzie, president of the McKenzie Construction Company, and his attorney, R. J. Boyle, Esq.,

on the one hand, and John W. Tobin, the then mayor of the city, S. F. Crecelius, flood prevention engineer for the city, and perhaps others, on the other hand. The suggestion was made that there was a conflict between paragraphs 14 and 63 of the proposed contract. This led to an interlineation being made to paragraph 14 of the proposed contract. After the interlineation the contract was signed by A. J. McKenzie, as president of appellee company, and John W. Tobin, as mayor of the city.

Paragraph 14, prior to the interlineation, read as follows:

"14. Losses from Natural Causes.

"All loss or damage arising out of the nature of the work to be done, or from the action of the elements, or from any unforeseen circumstances in the prosecution of the same, or from unusual obstructions or difficulties which may be encountered in the prosecution of the work shall be sustained and borne by the Contractor at his own cost and expense."

The interlineation which was added to this paragraph was as follows: "Except damage done by flood to material and work above elevation 685.00."

Paragraph 63, which it was suggested was in conflict with paragraph 14, read in part as follows:

"63. Concrete—Preparation of Foundation.

" * * * In case that a flood, which the contractor could not reasonably be expected to control, (rising above elevation 685) should cause foreign materials to be deposited on the foundation the Contractor shall remove same in a satisfactory manner and he shall be paid for such work at cost plus fifteen per cent."

It is clear that before the interlineation all loss or damage by flood was to be borne by the contractor, except that he was entitled to cost plus 15 per cent. for removing foreign material that might be deposited by flood on the foundation, but after the interlineation all damage done by floods rising above elevation 685, to work and material, was to be borne by the city. This was unquestionably a material alteration of the proposed contract.

Its materiality is fully shown by the following correspondence which passed

between Col. Crecelius and **Mr.** McKenzie:

On June 4, 1926, **Col.** Crecelius wrote Mr. McKenzie, in part, as follows: "If you are particularly anxious to concrete the section of the dam proper between cofferdams, I will permit you to do so on condition that .you strike out the provision in the contract which relieves you of responsibility for damage by floods above elevation 685.00 (which was written into the contract after your bid was accepted) and if you further agree to assume full responsibility for all damages to plant and materials resulting from floods."

To which Mr. McKenzie, on June 14th, replied as follows: "With reference to relieving the City of all responsibility in case of flood rising above elevation 685, we feel, in view of the circumstances in connection with the awarding of this contract, that this is rather an unusual request. It is recalled that the writer obtained your interpretation of the latter part of Article 63 of the specifications with reference to the responsibility the City would assume in case a flood should rise above elevation 685 before bids were received, and that we transmitted with our proposal a letter quoting as nearly verbatim as possible your interpretation of this clause. As a result of this interpretation we reduced our original proposal $20,000.00. After bids were received, you raised objection to our letter accompanying our proposal, and after you admitted that the letter stated, in substance, your interpretation of the specifications, we withdrew same, and later rewrote a similar clause in the contract. It would therefore seem fair and just that if you now desire us to assume the responsibility for any damage done by floods rising above elevation 685 that we should be permitted to increase our contract price the proper pro rata amount of the $20,-000.00 deducted from our original proposal. If you are willing to make this adjustment, we shall be glad to assume the responsibility, otherwise we do not think it is just to request it of us, and we prefer to let the responsibility rest as it now stands."

On June 16th Col. Crecelius replied: "You seem to misunderstand my proposal in regard to your taking responsibility for damage done by flood above eleva-

tion 685. I did not ask you to take this responsibility, I merely offered to let you do so if you preferred this to keeping the channel open until I consider it safe to make the closure."

The materiality of this interlineation is further shown by the fact that appellee recovered various items of damage, aggregating several thousand dollars, as a result of the flood prevention engineer's failure to deliver the center section of the foundation of the dam. The above correspondence shows that one reason this section was not delivered sooner was that the engineer was concerned about the liability of the city, as a result of the interlineation.

The record discloses that material for the construction of the dam was stacked on the upstream side of the dam and that approximately $20,000 worth of such material was on hand at all times. Under the interlineation, all damage done to this material by floods arising above elevation 685 was to be borne by the city. This fact throws some light on what was in Col. Crecelius's mind when he did not consider it safe to close the center section unless appellee would waive the provisions of the interlineation.

The jury's answer to special issue No. 19, and its subdivisions, gave to appellee the sum of $7,592.55, as its damages caused by the failure of the engineer to sooner deliver the center section of the dam. The jury's answers to special issue No. 20, and its subdivisions, gave to appellee the sum of $3,218.05 for damages to its trestle and tracks caused by the delayed delivery of the center section of the foundation. The jury's answers to special issue No. 56, and its subdivisions, gave to appellee the sum of $5,946.04 for cleaning out the spillway and jump chamber section, and this damage is found to be the result of the delayed delivery of the center section of the foundation. These items of damages show how far-reaching the effect of the interlineation to paragraph 14 may have been. It cannot possibly be treated as an immaterial alteration of the proposed contract.

It is also clear that Mayor Tobin had no authority to execute any other contract than the one set out in the instructions to bidders. The City Charter provides, in section 20, that the city

cannot contract otherwise than by ordinance. There was no city ordinance authorizing the execution of the contract which was executed, and it is null and void, under section 40 of the City Charter, unless, as contended by appellee, it was subsequently ratified by ordinance duly passed by the board of city commissioners.

■ The jury found that none of the commissioners ever knew that a different contract had been executed other than the one authorized by the ordinance accepting the "McKenzie Proposition."

It is true, the board of commissioners passed ordinances appropriating money to pay estimates as the work on the dam progressed, and passed another ordinance accepting the roadway across the dam, without prejudice to the rights of either party under the contract, but these ordinances cannot be regarded as a ratification of the altered contract of which the jury found they had no knowledge. Before there can be ratification there must be an intention to ratify, with a full knowledge of all the facts.

In 1 McQuillin, Mun. Corp. § 386, it is stated: "When the charter or law applicable prescribes the mode of contracting, for example, that mode must be observed. So in ratifying an unauthorized contract, the mode for making must be followed. Nor is there any material difference in this respect between the powers of a municipal corporation when acting in its political and governmental capacity and when acting with reference to its private property. In conferring the power, with direction as to its exercise it is the intention that it shall be exercised by the body and in the mode prescribed, and any departure from such authority or any attempt by the body to transfer their powers to others is unwarranted. * * * So where the charter provides that a particular power shall be exercised by ordinance, its exercise in any other manner, as by contract or resolution, would not be legal."

And in § 387: "Where the charter requires the passage of an ordinance—a legislative act—by the council, to accomplish the object desired, an ordinance is indispensable; the power cannot be delegated to others." See, also, Nichols v. State, 11 Tex.Civ.App. 327, 32 S.W. 452.

■ Upon sufficient pleading and proof, the city might be required to pay for benefits received and not paid for upon the grounds of implied contract or estoppel. 3 McQuillin Mun.Corp. § 1283. However, this suit is based solely and squarely upon an expressed contract, and failure to establish an expressed contract is fatal to appellee's cause of action. City of Mission v. Eureka Fire Hose Mfg. Co. (Tex.Civ.App.) 67 S.W.(2d) 455.

The contract entered into by appellee and the mayor was an essentially different contract from the one authorized by ordinance and is therefore null and void. Staebler & Gregg v. Town of Anchorage, 186 Ky. 124, 216 S.W. 348; Zottman v. City and County of San Francisco, 20 Cal. 96, 81 Am.Dec. 96; Morse v. City of Boston, 253 Mass. 247, 148 N.E. 813; London Guar. & Acc. Co. Ltd. v. City of Beaumont (Tex.Civ.App.) 139 S.W. 894.

It might be well to here state that the jury further found that the altered contract was never submitted to, or passed upon by, the board of city commissioners.

The contract declared upon by appellee being a nullity, its cause of action must fail, and the judgment of the trial court must be set aside.

The conclusion we have reached herein renders it unnecessary to discuss other assignments of error.

Accordingly, the judgment will be reversed, and judgment here rendered that appellee take nothing and pay all costs of this court and the court below.