### CITY OF SAN ANTONIO et al. v. McKENZIE CONST. CO

No. 9510.

Court of Civil Appeals of Texas. San Antonio.

March 6, 1940.

Rehearings Denied April 3, 1940.

T. D. Cobbs, Jr., and Brooks, Napier, Brown & Matthews, all of San Antonio, Boone, Henderson, Boone & Davis and B. D. Tarlton, all of Corpus Christi, and Henry B. Dielmann and J. I. Kercheville, both of San Antonio, for appellants.

Dodson & Ezell, of San Antonio, and Kleberg, Eckhardt & Lowe, M. G. Eckhardt, and H. R. Sutherland, all of Corpus Christi, for appellee.

MURRAY, Justice.

This suit was brought by McKenzie Construction Company, a corporation engaged in the construction business, against the City of San Antonio and its Mayor and Commissioners, on a contract for the construction of a flood detention dam across Olmos Creek.

There have been two trials of this case in the trial court. The first trial ended in a judgment for the City of San Antonio, its mayor and other officers, against the McKenzie Construction Company, based upon an instructed verdict by the court. McKenzie Construction Company prosecuted an appeal from that judgment to this Court. This Court reversed the judgment and remanded the cause. McKenzie Construction Company v. City of San Antonio et al., Tex.Civ.App., 50 S.W.2d 349, writ of error refused.

The second trial resulted in a judgment for McKenzie Construction Company against the City of San Antonio et al. in the sum of $82,157.08, with interest at the rate of eight per cent per annum from February 24, 1927, until paid. The judgment also authorized the issuance of a mandamus. The City of San Antonio and its officers prosecuted an appeal from that judgment, and this Court, sustaining the points presented by Division III of appellants' brief, reversed the judgment of the trial court and rendered judgment that appellee, McKenzie Construction Company, take nothing. City of San Antonio et al. v. McKenzie Construction Company, Tex. Civ.App., 88 S.W.2d 622. A writ of error was granted by the Supreme Court, and upon a hearing in that Court the points raised by Division III of appellants' brief were overruled and our judgment reversed and the cause remanded to this Court for con-

sideration of other assignments of error presented in appellants' brief. McKenzie Construction Company v. City of San Antonio, 131 Tex. 474, 115 S.W.2d 617.

We will not here make a full statement of the nature of the suit, but, in the interest of brevity, refer to the above mentioned opinions for such statement.

We now come to a consideration of the other points presented by appellants' brief, not contained in Division III.

The first division of appellants' brief relates to alleged jury misconduct. The testimony taken upon appellants' motion for a new trial conclusively shows that the verdict of the jury was rendered under the following circumstances:

Shortly after the trial began one of the jurors wrote the following letter to B. D. Tarlton, Esquire, of counsel for the City of San Antonio, to-wit:

"Corpus Christi, Tex.
"11/15/33.
"Mr. B. D. Tarlton,
"903 Nixon Bldg.,
"Corpus Christi, Tex.
"Dear Sir:
"I wanted to talk to you several times but as a juror on this McKenzie case I did not do it, to keep away any reflection that it could cause.
"I know that you are an honest and straight man not only as a lawyer but also as a friend.
"This case is drawing towards the end and when it ends I will be in need for a steady work for winter, as the work with the Navigation District, where I was working, has slacked so now that it would be hard to make a living there during winter.
"Any one who wants to get a job now a days must have a pull. And if I can get you to pull for me I feel safe that there would be something turn up for me. I can do the work myself and I can see to that the other man does his work. I am used to work and I can read, write and figure that I can do the lighter class of work; as, I held once a second grade teachers certificate.
"The Southern Alkalie Company may employ me at your recommendation or some other concern, either here or some other place, where I could send my boy to Catholic school.
"Will see you when this case is over.
"Respectfully yours
"J. J. Slavik."

This letter was shown by Tarlton to the trial judge and at his suggestion to opposing counsel. Neither side then and there asked for a mistrial and thereby condoned or waived the matter.

At a later date, according to the testimony of Slavik, one Shorty Powell made the following statement to him:

"The Reporter (Reading) 'What did he tell you,'—meaning Shorty Powell.

"A. Well, the first time he told me that he said he was working on the dam himself, Shorty Powell did. He said that Colonel Crecelius, that is the substance of it, didn't amount to much, because he was an army officer, and all he cares for is his drinks and good times, and he mentioned vile language about himself, about the Colonel, and he said all that he was trying to do was trying to work against the working man, to take the bread away from the working man,—that was about the substance of what he told me.

"Q. Did he tell you,—state whether or not he told you anything about McKenzie, whether or not he was right in the case? A. Well, I think he did.

"Q. Now. Mr. Slavik, did you go,— what did he call Colonel Crecelius, if you remember? A. Why—

"Q. It is all right, if you remember, what did he say about him? A. Well, he, every time, instead of calling him by name, he called him a son-of-a-bitch.

"Q. Mr. Powell did? A. Yes sir."

On another occasion, according to juror Slavik's testimony, Willie Manak had the following conversation with him, to-wit:

"Q. What did he tell you? * * * A. While I was talking to Mr. Manak about things not concerning this case at all, Mr. Cech, Frank Cech, took him away from me and told him, and when Mr. Manak came back to me, he told me that Mr. Cech told him to tell me, he said, 'That man you was talking to was a member of the jury of the McKenzie case?' and Mr. Manak told me that he told him that I was. He said, 'Tell him that it wouldn't be fair to beat McKenzie out of his money, that the City of San Antonio beat McKenzie out of money, it wouldn't be fair.' "

Slavik told of the following second conversation with Shorty Powell, to-wit:

"Q. What was the occasion of that conversation and what did he say to you at that time and you to him? A. Well, I

went down to the grocery store to buy my provisions, and he just happened to be there, and he waited for me until I got out and told me that he knew all about how these contracts were let and a certain other company was to get the contract for building this dam that would have paid to the political bunch at San Antonio,—I don't know what he meant by that, but when Mr. Tobin found out what would have happened, he wouldn't let this Company have the contract, and gave it to Mc-Kenzie."

The above conversations occurred after Slavik was selected as a juror and before the verdict was returned. The jurors were permitted to separate and these conversations occurred while they were separated.

After the evidence was closed, the arguments made and the jury had begun consideration of their verdict, and after Slavik had stated that he would not agree to find Colonel Crecelius guilty of fraud (this being the all important issue in the case), Slavik told of the following conversation with another juror named Shepard, to-wit:

"Q. What did Mr. Shepard tell you? A. He told me that,—he took me off to one side, where the other jurors wouldn't hear us and told me that I had wrote this letter, and that it will bring me lots of trouble if I keep on, if I was just as rigid on these questions as I was that morning. * * *

"Q. Did he mention my (Tarlton's) relationship to it to you? Did he say anything about me having reported it to the Court? A. Well, he said Mr. Tarlton must not be very much of a fellow since he done it.

"Q. After Mr. Shepard had told you about the jury knowing about this letter, what did you do then? A. Well, I consented to these questions, to vote on these questions, but every question that came, I told them that I take my exception, that I do not believe that the Colonel was guilty of fraud and bad faith.

"Q. Would you have voted to have answered those questions that way if Shepard had not told you this? A. I don't—I would not."

Slavik admitted that the jury were polled in open court and that he answered that the verdict was his. He also admitted that the foreman told him that he had to either answer "yes" or "no" that he could not vote "yes" and say at the same time he did not believe that way.

The juror B. E. Anderson testified in part as follows:

"Q. You told me, in substance, this, that the reason you told Shepard to tell Slavik about the knowledge of the jury that he had written a letter to me was because you wanted to use that prior to reporting him to the Court? A. Will you let me answer that and tell you what I told you?

"Q. Answer the question 'yes' or 'no.'

"The Court: Answer that question, first.

"A. I didn't tell you that; let me tell you what I told you.

"Q. All right, you didn't tell me that? A. No sir, I would like to tell you what I did tell you, though.

"Q. That's what you say? A. I never told Shepard,—I made Shepard promise when I told him about it that he would not tell Slavik, that he would let Slavik go until he got to the point where we couldn't handle him,—I impressed that upon him forcibly, and he promised that he wouldn't, but he took it upon himself and told him.

"Q. What did you mean by the point where you couldn't handle him? A. Where we saw we had a hung jury.

"Q. When you started to have a hung jury? A. When we saw we had a hung jury, we would tell him, yes sir.

"Q. And if Slavik got to the point where you couldn't handle him, you were going to spring that on him? A. Yes sir, that's what I told Shepard, if he ever got to the point where we couldn't do anything about, we would tell him. I made him promise to keep still if Slavik came clean, we would say nothing about it. I told him that might be a penitentiary offense to Slavik.

"Q. That was some time before the charge was submitted? A. I said about a week.

"Q. That you told Shepard that? A. Yes sir, I said about a week, I cannot recall the exact date, I think it was about a week, something like that."

The juror Max M. Shepard testified in part as follows:

"Q. You retired and went into consideration of the case? A. Yes sir.

"Q. Was Mr. Slavik in disagreement with you when you went out? A. When we got up in the jury room, you mean?

"Q. Yes? A. Yes, he seemed to be holding the thing up a little bit,—we wanted to get through.

"Q. And when you came back from lunch, did you go to him and make any remark to him about a letter that he had written to me? A. Yes, I talked to him just a little bit about it.

"Q. What did you say to him? A. Well, I told him that I had heard about the letter, after we came back from lunch, I took him, the rest of the jurors all went inside, in the little room where the table was, where we all discussed the questions, and I asked Mr. Slavik outside a minute, and told him I wanted to talk to him, and told him I had heard about the letter, and that if he was holding out in answering those questions like he thought was right, that was all that could be did about it, but on account of that letter, if he was just hanging up the whole thing, we wanted to get through, and I figured he wasn't right about it.

"Q. Did you tell him the other jurors knew about the letter? A. I told him that somebody told me about it, I told him that one or two of the other jurors knew about it or maybe all of them, I wasn't sure.

"Q. Did you tell him who told you? A. Yes, I told him Mr. Anderson made the remark that he had written the letter, and I didn't want to make it appear that I was meddling in his business, that it was his own business, whatever he wanted to do, but I would like to see him try to answer the questions, if he could, and not be holding everybody up, if he felt like the questions had been written one way and because he had written this letter he thought he was going to get something out of it and he felt like he ought to answer the questions one way. He didn't tell me what he was going to do about it at all, I just talked to him and we came on inside and I don't know whether it did any good or not by me talking to him, but I wanted to get away, I think all the rest of them were tired of the case, too.

"Q. What was your purpose in talking to him? A. Just like I told you, I wanted to get out and get through with the case and get home, I didn't want to be locked up three or four weeks.

"Q. Did you think it was necessary to tell him? A. I don't know, it looked like it.

"Q. Now, Mr. Shepard, did Mr. Anderson tell you to tell him that? A. No sir, Mr. Anderson just told me about it, I guess a week or two before the trial, and I had gone up there, I was wondering about it, and wondering what I was going to do about it, if he was going to try to hang it, I didn't know just what I was going to do, and after we got inside and started the case, I thought the best thing to do would be to talk to him and tell him that I knew about it.

"Q. Had you threatened,—what did Anderson say when he told you about it? A. He just told me he had heard Mr. Slavik had written a letter.

"Q. What else did he say? A. I don't remember just what he did say, Mr. Tarlton, I don't remember just how the conversation came up or anything, I do remember that he said he heard Mr. Slavik had written you a letter and that you had told, —and you had brought it to the Judge or something like that, and told him about it.

"Q. Did he say anything to you why he was telling you? A. I don't remember just what he did say about it, no sir.

"Q. Had you all been discussing Mr. Slavik, and his position in the case? A. Yes sir, I believe we had.

"Q. What had you discussed about Mr. Slavik and his position in the case? A. Well, there was a little discussion around; some of them thought that he was, he felt that way about it, just,—we didn't know what to think about it, hardly; some of us thought one thing about and some of us thought another; some of us thought he was fixed and some of us thought he wasn't. We didn't know what to think, we didn't know."

The juror Winn testified in part as follows:

"Q. * * * Did anyone tell you about that letter? A. Yes sir, there was a fellow told me about it.

"Q. A fellow told you about it? A. Yes.

"Q. Who was it? A. A fellow by the name of Messer.

"Q. Messer,—Lon Messer? A. Yes sir.

"Q. Lon Messer? A. Yes sir.

"Q. Did he tell you that the letter had been shown to the court, do you remember that? A. Yes sir."

■ There were over three hundred pages of testimony relating to the alleged misconduct of the jury, and it is impossible to set it all out here. We conclude that the evidence conclusively shows that the jury was guilty of misconduct and that such misconduct influenced at least the juror Slavik in arriving at his answers to the special issues.

Article 2203, R.C.S.1925, provides in part: "No verdict shall be rendered in any cause except upon the concurrence of all members of the jury trying the case."

Article 2234, R.C.S.1925, reads as follows: "Where the ground of the motion is misconduct of the jury or of the officer in charge of them, or because of any communication made to the jury or that they received other testimony, the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if such misconduct proved, or the testimony received, or the communication made, be material."

In Moore v. Ivey, Tex.Com.App., 277 S.W. 106, 107, the court said: "The determinative rules, or principles, of law are plain and well established. If, upon a consideration of the whole of the pertinent record, it is reasonably doubtful whether or not the improper conduct affected the amount of the verdict or the decision of any other material issue, the verdict should be set aside by the trial judge; if, in such a case, a new trial is not granted, there is an abuse of discretion by the trial judge, and reversal becomes the duty of appellate courts. Houston & T. C. R. Co. v. Gray, 105 Tex. 42, 143 S.W. 606; Southern Traction Co. v. Wilson, Tex.Com.App., 254 S.W. 1104; Hines v. Parry, Tex.Com.App., 238 S.W. 886. It may be clear that eleven (or a lesser number) of the jurors were not, to any degree, influenced by the improper conduct; yet if it remains reasonably doubtful whether one (or a larger number) was, or was not, influenced, the vice remains and the verdict must be set aside (Southern Traction Co. v. Wilson, supra) because each juror can rightly agree to the verdict only when guided solely by the instructions of the trial judge and the evidence heard in open court."

In Casstevens v. Texas & P. R. Co., 119 Tex. 456, 32 S.W.2d 637, 638, 73 A.L.R. 89, we find the following:

"The case of Houston & Texas Central Railroad Co. v. Gray, 105 Tex. [42], 43, 143 S.W. 606, definitely established the rule that the discretion vested in the trial court in passing on a motion for new trial is subject to review in the Supreme Court where the uncontroverted facts disclose misconduct by a jury in reaching a verdict, unless such facts negative beyond reasonable doubt that the misconduct actually influenced any juror in giving assent to the verdict. The opinion of Chief Justice Brown in Gray's Case merely affirms the power of the Supreme Court to enforce, on undisputed facts, the law of the state as embodied in the Constitution and statutes.

"Section 15 of the Bill of Rights guarantees that 'the right of trial by jury shall remain inviolate,' and commands that the Legislature shall maintain the purity and efficiency of jury trials. Section 13 of article 5 prescribes that twelve men shall compose a petit jury in the district court, and that nine members of the jury may render a verdict in trials of civil cases and of certain criminal cases in the district court, provided that the Legislature may change the rule authorizing less than the whole number of the jury to return a verdict. The Legislature, in pursuance of its express constitutional authority, has provided that 'no verdict shall be rendered in any cause except upon the concurrence of all members of the jury trying the case,' and has required the court to discharge the jury when they cannot agree. Revised Statutes, articles 2203, 2200."

■ Appellee contends that the jury misduct, if any, was waived by appellants because appellants first filed motions for judgment on the verdict, and judgment non obstante veredicto before filing their amended motion for a new trial setting up the alleged misconduct of the jury, and by filing such amended motion subject to and without waiving their motions for judgment. Appellee cites no authority for this contention, nor have we been able to find any. Appellants could not know in advance what the ruling of the trial court would be, and in order to properly present the matter to the trial court they were compelled to file these inconsistent motions. All motions were filed before the court ruled and the court was thereby put on notice that in the event judgment was not rendered in appellants' favor they were going to contend that there was material misconduct of the jury.

We sustain the points presented by Division 1 of appellants' brief.

Appellants' points 2 to 6 relate to alleged improper argument made by appellee's counsel in his closing argument. No objection was made at the time to such argument, nor was the court requested to instruct the jury not to consider such argument. The argument was not of such a highly inflammatory nature that a timely instruction by the court to the jury not to consider it would not have removed the harm done. Appellants not having excepted at the time the argument was made, and not having requested the court to instruct the jury not to consider such argument, are not now in a position to complain. The rule is that unless argument is so improper and of such a harmful nature that an instruction by the court to the jury, informing the jury that such argument was improper and that they are not to consider it, would have done no good and could not have removed the damage done, it is the duty of opposing counsel to object to such argument at the time it is made and request a charge from the court to the jury not to consider such argument. City of Pampa v. Todd, Tex.Com.App., 59 S.W. 2d 114; American, etc., Land Mortgage Co. v. Brown, 54 Tex.Civ.App. 448, 118 S.W. 1106, error refused; Black v. Wilson, Tex.Civ.App., 187 S.W. 493; Houston E. & W. T. R. Co. v. Sherman, Tex.Civ.App., 10 S.W.2d 243, reversed, Tex.Com.App., 42 S.W.2d 241; Gray v. Allen, Tex.Civ.App., 269 S.W. 510; Dallas Railway & Terminal Co. v. Price, Tex.Civ.App., 94 S.W.2d 884, affirmed 131 Tex. 319, 114 S.W.2d 859; American Nat. Ins. Co. v. Smith, Tex.Civ. App., 97 S.W.2d 963; Wichita Valley Ry. Co. v. Minor, Tex.Civ.App., 100 S.W.2d 1071; Dallas Ry. & Terminal Co. v. Little, Tex.Civ.App., 109 S.W.2d 289.

Under Division IV appellants present their points 11 to 14, both inclusive. These points present the contention that there are cerain conflicts between answers to several of the special issues. As these questions will not probably arise upon another trial we pretermit a discussion of them here.

Points 15 to 26, inclusive, are submitted in Division V of appellants' brief. They are all without merit and are overruled.

Point 27 is presented in Division VI of appellants' brief. It reads as follows: "It is fundamental and reversible error for the Court to fail to submit definitely the different elements of damages to be recovered." This point is based upon assign-ment of error No. 41, which is in exactly the same language.

The point and assignment are both too general to present anything to this Court for review. They present nothing more than an abstract statement.

Points 28, 29, 30, 31 and 32 are presented by Division VII of appellants' brief. Points 28 and 29 are presented upon assignments 16, 22, 23 and 25. These assignments do not raise the questions presented by these points, therefore, the points cannot be considered. Point 30 presents the contention that the jury having found that some of the City's materials, cement and empy sacks were used, wasted and lost by plaintiff while the dam was being constructed and further that the engineer was not guilty of fraud, bad faith or failure to exercise an honest judgment in so deciding, the court committed error in not allowing the deduction of the engineer for materials, cement and empty sacks used, wasted and lost, amounting to $1,533.01, although the jury had found that such deduction had been improperly made by the engineer. We overrule this contention. It is not clear from the question and answer whether or not the jury intended to find that some of the City's cement was used or some of its materials were wasted or some of the empty sacks were lost. There is evidence that the contractor was authorized to use some of the City's cement without cost to it. There is no finding as to the value of the materials, cements or empty sacks, the value may have been only nominal. No error is therefore shown in failing to allow the deduction of $1,533.01.

Points 31 and 32 are without merit and are overruled.

This brings us to a consideration of Division VIII of appellants' brief. Points 33 to 50, both inclusive, are presented in this Division. The judgment as entered included the sum of $27,334.69 as damages imposed upon appellee for the excess cost of forms above elevation 710, caused by the requirement of the engineer that the steel form be held in place seven days. This item of damage is based upon the jury's answers to Special Issue No. 40. This issue contained eight subdivisions, lettered from (a) to (h) inclusive, and together with the jury's answers read as follows:

"Special Issue No. 40.

"(a) Do you find from a preponderance of the evidence that the statements and

conduct of the flood prevention engineer for defendant City at the time plaintiff delivered to said engineer the steel form detail in evidence were calculated to reasonably cause plaintiff to believe, in the exercise of ordinary care and in good faith, that said engineer thereby consented to and approved a plan for the removal of said form twice a week on the roadway section of the Olmos Creek detention dam above elevation 710? Answer: Yes.

"(b) Do you find from a preponderance of the evidence that the plaintiff did procure the steel forms in a good faith belief that the engineer for the defendant City had in effect consented to and approved the use of said form when being removed twice a week on said roadway section of the dam? Answer: Yes.

"(c) Do you find from a preponderance of the evidence that plaintiff procured the steel forms according to and as shown on the blue print drawing delivered to the engineer for the defendant City, and which is in evidence as Exhibit 121? Answer: Yes.

"(d) Do you find from a preponderance of the evidence that the requirement of said engineer for the defendant City that the steel form be held in place seven days was willful on the part of said engineer, whereby he sought to injure plaintiff and to wrongfully deprive plaintiff of its right under the contract alleged? Answer: Yes.

"(e) Do you find from a preponderance of the evidence that the requirement of said engineer that said steel form be held in place seven days did delay plaintiff in the time of completion of the construction of the dam? Answer: Yes.

"(f) Do you find from a preponderance of the evidence that the requirement of said engineer that plaintiff hold the steel form in place seven days did inflict upon plaintiff any financial damage for excess cost of forms? Answer: Yes.

"(g) How much do you find, from a preponderance of the evidence, would have been the reasonable damage imposed upon plaintiff for the excess cost of forms above elevation 710, caused by the requirement of said engineer that the steel form be held in place seven days? Answer: $27,334.69.

"(h) Do you find from a preponderance of the evidence that the refusal of said engineer to allow plaintiff any extension of time by reason of the requirement that the steel form be held in place seven days was

willful on the part of said engineer, whereby he sought to injure the plaintiff and to wrongfully deprive plaintiff of his right under the contract alleged? Answer: Yes."

Special Issues Nos. 41 and 42, with the jury's answers, read as follows:

"Special Issue No. 41. Do you find from a preponderance of the evidence that the engineer, in October, 1925, made and announced a decision authorizing plaintiff to remove the steel form twice a week? Answer: No.

"Special Issue No. 42. Do you find from a preponderance of the evidence that the engineer agreed with plaintiff that plaintiff might procure a single Blaw Knox steel form for use in pouring the superstructure of the dam and move same twice a week? Answer: Yes."

The evidence shows that some time before the work started on the super-structure of the dam, which was above elevation 710, A. J. McKenzie, president of appellee company, had under consideration the purchase of a steel form to be used in this work. He made this fact known to the engineer. In this connection, the engineer was informed that appellee expected to move this steel form twice a week. With this information before him, the engineer approved the steel form. McKenzie then leased a steel form at a cost of $13,500. Shortly before the work started on the super-structure the engineer wrote McKenzie a letter telling him, in effect, that the steel form would have to remain in place for a period of seven days. McKenzie, in replying to this communication, had the following to say in his letter of February 12, 1926: "We followed the recommendation of the Blaw-Knox representative in purchasing these forms, and as we submitted the matter to you, and you raised no objection at that time, we naturally assumed that you approved of the method adopted." The steel form was used for part of the work, but wooden forms were built and used in the construction of most of this work.

■ The evidence further shows that according to the best known methods and usages of building super-structures of this nature the forms should have been kept in place at least seven days. No damages could be charged to the city as a result of the engineer requiring the work to be done in a manner in keeping with the usual and

customary methods of doing such work. Carlile, Corrigan & Dunn v. Corrigan, 83 Ark. 136, 103 S.W. 620. Appellee contends that if the engineer had made laboratory tests he would have found out that the forms could have been held in place less time. The engineer was not required to make laboratory tests to discover better methods than those usually and customarily employed in such work. Sweet v. Morrison, 116 N.Y. 19, 22 N.E. 276, 15 Am.St. Rep. 376; Lynn v. Baltimore & Ohio R. Co., 60 Md. 404, 45 Am.Rep. 741.

Appellants seem to take the position that the engineer having failed to speak at the time it was made known to him that steel forms were to be used and that their removal twice a week was contemplated, he would be thereafter estopped from making any other requirement than that understood by the contractor at the time. The contract provided that forms could not be removed until approved by the engineer and it became the duty of the engineer to see to it that forms were not prematurely removed. He owed this duty to both the city and the contractor and he could not estop himself from properly performing this duty.

The evidence shows that it took almost two and one-half days to remove and reset the steel form. If the form had been moved twice a week it could not have remained in place more than one day, which certainly would not be sufficient time under a slab of unsupported concrete fifty feet long and several feet thick. The evidence is insufficient to show that the engineer was guilty of fraud, or the equivalent, in ruling that the steel forms should remain in place seven days. It does not even show that his decision was incorrect.

What was said in Vanderwerker v. Vermont Cent. R. Co. (Supreme Court of Vermont) 27 Vt. 130, applies here, to-wit: "A review of the authorities cited will suffice to demonstrate that the proof of a party who attacks the award of an agreed umpire in a case of this character must be clear, convincing, overwhelming, and irrefragable. It must come within close proximity to what is called beyond a reasonable doubt. Such proof must meet these standards in order to have substance, and it must have substance in order to be regarded as substantial within the substantial evidence rule so oft repeated by this court."

The points raised in Divisions IX, X, XI, XII and XIII, are without merit and are overruled.

Points 95 to 103, inclusive, are presented in Division XIV. The judgment allows a recovery of $6,091.74 for the fraud of the engineer in requiring the forms for the conduit section to be constructed in the manner in which they were constructed. In view of another trial we will refrain from a detailed discussion of the evidence on this issue, other than to say we entertain serious doubts as to whether the evidence is sufficient to support the judgment on this item. And the same thing is true as to the points raised in Division XV.

The points raised under Division XVI are without merit and are overruled. The same thing is true as to the points raised under Divisions XVII and XVIII.

Under Division XIX the contention is raised that the evidence is insufficient to convict the engineer of fraud, or the equivalent, in any instance. There could be no recovery in this case unless the engineer was guilty of fraud, or such a gross mistake as to necessarily imply bad faith or a failure to exercise an honest judgment. When this case was first before this Court (50 S.W.2d 349, 352) the Court held: "Appellant's pleadings and the proof introduced thereunder in the court below were sufficient to entitle it to a determination of the issues involved by a jury, and we so hold."

The Supreme Court refused a writ of error and that holding has now become the law of this case. McKenzie Construction v. City of San Antonio, 131 Tex. 474, 115 S.W.2d 617. The record is substantially the same on this appeal, and we therefore overrule the points presented in this division.

Division XX relates to certain alleged errors in admission of evidence. Inasmuch as the case must be reversed on other grounds, we pretermit a discussion of the points presented in this division.

Division XXI relates to the giving and refusing of charges and for the above reason will also not be discussed.

Division XXII relates to alleged errors in submission of duplicitous and multifarious issues, and the final Division XXIII relates to alleged errors in the failure and refusal of the jury to answer certain issues submitted to them. In the interest of brev-

ity we refrain from a discussion of these matters, as we do not believe such a discussion will be helpful upon another trial.

The judgment is reversed and the cause remanded.

### On Motion for Rehearing.

In view of the fact that we have reversed this case because of the misconduct of the jury, in passing on other points, we have not discussed procedural questions, as we presume they will not arise in the same matter upon another trial. For instance, some of the questions are not in proper form and are not followed by proper and necessary instructions and explanations, but we have not discussed such matters as we presume they will not appear upon another trial. It goes without saying that if upon another trial issues are improperly formed, or definitions or instructions are incorrect, same may be considered upon another appeal, if proper objection and exceptions are made below and presented on appeal.

The same thing is true as to admissibility of evidence.

Appellants' and appellee's motions for rehearing have been carefully considered and are in all things overruled.