## CITY OF SAN ANTONIO ET AL V. MCKENZIE CONSTRUCTION COMPANY.

No. 7789. Decided March 19, 1941.
Rehearing Overruled May 14, 1941.
(150 S. W., 2d Series, 989.)

316

*J. I. Kercheville,* City Attorney, *Henry B. Dielmann,* Assistant City Attorney, *Brooks, Napier, Brown & Matthews,* all of San Antonio, for plaintiff in error.

On the question of misconduct of jury cited: Traders & Gen. Ins. Co. v. Lincecum, 130 Texas 220, 107 S. W. 585; Moore v. Ivey, 277 S. W. 106; Dallas Ry. & Ter. Co. v. Garrison, 45 S. W. (2d) 185.

In respect to the right of the engineer to require the concrete forms to remain a certain length of time before being removed: Kilgore v. North West Texas Baptist Education Soc., 89 Texas 465, 35 S. W. 145; Galveston, H. & S. A. Ry. Co. v. Henry & Dilley, 65 Texas 685.

*Dodson, Ezell & Duke,* of San Antonio, *Kleberg, Eckhart & Lowe,* of Corpus Christi, and *Black, Graves & Stayton,* of Austin, for defendant in error.

Penalties may not be assessed for delays caused by the Engineer in refusing to permit the forms to be removed from the concrete construction earlier than he did, nor can penalties be assessed after the city has taken possession of the dam and put it in use. Wright v. Meyer, 25 S. W. 1123; Collier v. Betterton, 87 Texas 440, 29 S. W. 468.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This suit was originally filed in the District Court of Bexar County, Texas, by the McKenzie Construction Company, a private corporation, against the City of San Antonio, a municipal corporation, and its governing officers, naming them. Simply stated, McKenzie Construction Company seeks by its petition to recover from the City a money judgment for more than $100,000.00, alleged to be due it by the City under an express written contract for the construction of a dam. It is alleged that the contract was duly entered into by and between McKenzie Construction Company and the City. It appears that the venue

of the case was, by agreement, changed to Nueces County, Texas.

We shall hereafter refer to McKenzie Construction Company as McKenzie, and to the City and its officers as the City.

This case has been twice tried in the district court. At the close of the first trial the district court peremptorily instructed a verdict for the City. As we understand it, such instructions were grounded principally upon the theory that the evidence conclusively showed that there was no valid contract between McKenzie and the .City. On appeal by McKenzie to the San Antonio Court of Civil Appeals the judgment of the district court was reversed and the cause remanded to that court for a new trial. 50 S. W. (2d) 349. In the opinion ordering such reversal it was held that the contract sued on was legally entered into. This Court "Refused" writ of error applied for by the City.

After this Court refused writ of error as above indicated, the case was again tried in the District Court of Nueces County, Texas, with the aid of a jury. Based upon the jury's verdict, judgment was entered for McKenzie in the sum of $82,157.08, with 8 per cent. interest from a date prior to the judgment. We will later refer to this matter of interest. The City appealed to the San Antonio Court of Civil Appeals. On original hearing on such second appeal the Court of Civil Appeals reversed its former ruling, and adjudged that the contract declared on by McKenzie was never legally entered into by it and the City. As a result of such ruling the Court of Civil Appeals entered judgment reversing the judgment of the district court and rendering a take nothing judgment for the City. 88 S. W. (2d) 622, 626. This Court then granted writ of error on the application of McKenzie. On hearing in this Court the holding of the Court of Civil Appeals that there existed no legal contract between McKenzie and the City was reversed. After the ruling just indicated, this Court remanded the cause to the Court of Civil Appeals to pass on the other questions of law and fact properly raised by the briefs and the record. 131 Texas 466, 115 S. W. 617. When the case again reached the Court of Civil Appeals, such court entered judgment reversing and remanding the cause to the district court for a new trial. 138 S. W. (2d) 568, 577. Both McKenzie and the City were dissatisfied with the rulings of the Court of Civil Appeals, and both made applications to this Court for writs of error. Both applications were granted, and the cause has been duly submitted in this Court.

A reading of the opinion of the Court of Civil Appeals will disclose that one of the grounds for reversing the judgment of the district court was its holding that this record, as a matter of law, shows that some of the members of the jury trying this case were guilty of misconduct during the trial; and from the whole of the pertinent record it is reasonably doubtful whether or not such misconduct affected the verdict on material questions.

■ We think it is the settled law of this State that where the jury is guilty of misconduct, and from the whole of the pertinent record it is reasonably doubtful to the appellate court itself whether or not such misconduct affected the verdict on any material question, such verdict will not be allowed to stand. Texas & N. O. Ry. Co. v. Parry, 12 S. W. (2d) 997; Bradshaw v. Abrams, 24 S. W. (2d) 372; Corn v. Crosby County Cattle Co., 25 S. W. (2d) 290; Elizondo v. Reagan, 55 S. W. (2d) 540; Walker v. Quanah, A. & P. Ry. Co., 58 S. W. (2d) 4; Dallas Ry. & Ter. Co. v. Garner, 63 S. W. (2d) 542. We also refer to the authorities cited by the Court of Civil Appeals on this question. We think it is also the settled law that where there is a real conflict of evidence touching the question as to whether or not misconduct of a jury actually occurred, the finding, express or implied, of the trial court on such question is final. Bradshaw v. Abrams, supra. Simply stated, if the misconduct occurs, the question as to whether or not it is calculated to injure is a question of law; but the question as to whether or not misconduct actually occurred is a question of fact, if the evidence on that issue is conflicting.

The trial court conducted a very extensive hearing on the issue of misconduct. The testimony in regard thereto comprises some 385 pages in the statement of facts. Manifestly it would be unreasonable to expect this Court to even make a condensed statement of such a record. It appears, however, that at some time after the trial had begun, one of the jurors, named Slavik, wrote a letter to one of the attorneys for the City. This letter is set out in full in the opinion of the Court of Civil Appeals. 138 S. W. (2d) 568, 570. In the interest of brevity we will not reproduce it here. It is sufficient to say that the letter, among other things, asked the attorney to aid the writer in securing a job. It also assured the attorney that he was an honest and straight man, not only as a lawyer, but also as a friend. It further stated that if the writer could get work with a certain company or some other concern, at the recommendation of the attorney, he could send his boy to school, and assured the at-

torney that he would see him when the case was over. As soon as the attorney to whom the letter was addressed received it, he took it to the trial judge, and also to opposing counsel. Neither side offered any objection to the juror's serving further, or asked for a mistrial,—and, as said by the Court of Civil Appeals, "condoned and waived the matter." By this we mean to say that both sides waived any right to object to Slavik's further serving as a juror merely on account of his having written the letter above mentioned. No suspicion attaches to any attorney in this case as to any wrongdoing with reference to this letter, or anything which happened in regard to the juror Slavik, or any other jury misconduct which may have happened afterwards.

As we understand this record, it is conclusively established that after the jury began its deliberations the juror Slavik was not in accord with the balance of the jury in regard to how some of the material issues should be answered. It is further shown that after deliberations had commenced this juror sulked and refused to participate in the discussions or to vote. It further appears that another member of the jury who knew about such letter suggested to Slavik that he should participate, as no verdict could be reached if he did not do so. This juror also suggested to Slavik that if he was right, to give his reasons and stand by them, but if he was expecting something in return for the course he was pursuing, because of the letter he had written, it might lead to trouble. It appears that after he had been talked to and reminded of his letter, Slavik participated in the jury's deliberations and agreed to the answers returned. It also appears that before the juror talked to Slavik, he (Slavik) had announced that he would never find bad faith on the part of the engineer, and that he thought such a finding would defeat a judgment for the City. We will not further attempt to detail the evidence, except to say that it shows that a number of the members of the jury found out about this letter. This information was not given to them in the trial, and if they found out about it, it was in some way that should not have happened.

■ To our minds, a verdict obtained under the above circumstances ought not to stand. Our Constitution guarantees a trial by a fair and impartial jury. This means that every member of the jury must be a fair and impartial juror. We think that no court can say beyond a reasonable doubt that, under the circumstances of this case, Salvik was free to act as an impartial juror, and that he did so act. He had written this letter while he was on the jury. Other members of the jury learned about

such letter. Slavik was not in accord with the other jurors on material issues. The letter was not properly before the jury. In spite of this, the letter was undoubtedly used in some way in dealing with Slavik. He was reminded of the fact that he had written the letter, and it was at least suggested that if he was expecting something in return for the course he was pursuing, the letter might lead to trouble for him. Such a suggestion was calculated to lead Slavik to believe that the juror talking to him thought that the letter he had written might get him in trouble if he pursued a certain course. When the entire transaction is considered in the light of the surrounding circumstances, it certainly cannot be said that the question as to whether or not Slavik's verdict was untainted with duress is free from doubt. It follows that the Court of Civil Appeals was correct in holding that the judgment of the district court in this cause should be reversed on account of the misconduct of the jury.

■ It appears that the City filed motion for judgment on this verdict. Also it filed motion for judgment non obstante veredicto. Later the City filed amended motion for new trial, setting up misconduct of the jury. Such motion was filed subject to and without waiving the motions for judgment. We are in accord with the holding of the Court of Civil Appeals that, under the record detailed, the City did not. waive its right to assert jury misconduct by filing the two motions for judgment.

■ It appears that when the jury reported its verdict in open court, every member of the jury was polled, and each juror, including Slavik, asserted that the verdict as returned was his verdict. McKenzie contends that the Court of Civil Appeals erred because it accepted the testimony of the juror Slavik, given by him on motion for new trial, for the purposes of impeaching his verdict, "after he had declared under oath and in open court, upon the poll of the jury when it returned its verdict, that the answer given by him to each special issue was his verdict." We overrule this contention. We hold that it was conclusively shown that misconduct occurred. Such being the case, the question of whether such misconduct might have affected the verdict becomes a question of law for us to decide.

The trial of this case went on for months. The record is one of the largest that has ever reached this Court. The brief of the City in the Court of Civil Appeals contains 745 printed pages, and the brief of McKenzie 375 printed pages. In addition, both parties have filed extensive briefs and arguments in this Court. Manifestly this Court cannot reasonably be expected to

review or discuss all of such a record. In view of the fact that the judgment of the trial court cannot stand, on account of the misconduct of the jury, we deem that it will be sufficient for this Court to announce certain rules of law which will govern another trial, if it is had. In doing this we will discuss directly some of the items of damage submitted to and found by the jury.

It appears that the jury found damages to McKenzie in the sum of $27,334.69, for the excess cost or expense incurred by McKenzie in being required by the engineer to leave concrete forms in place for seven days at a time above Elevation "710." This item of damages is found in favor of McKenzie by the jury's answers to the questions submitted under the several subdivisions of Special Issue No. 40, and under Special Issues Nos. 41 and 42.

The Court of Civil Appeals holds that the findings of the jury on the issue of fraud of the engineer as to this item of damages find no legal support in the evidence. We agree with that holding.

An examination of the contract between the City and McKenzie shows that it contains the following provisions:

"3. *Engineer.* Whenever the word ENGINEER is used in this contract, it shall be understood as referring to S. F. Crecelius, Flood Prevention ENGINEER of the CITY, or such other ENGINEER, superintendent or inspector as may be authorized by said CITY to act in any particular."

"4. *Interpretation of Phrases.* Whenever the words, 'Directed,' 'Required,' 'Permitted,' 'Designated,' 'Considered Necessary,' 'Prescribed,' or words of like import are used, it shall be understood that the direction, requirement, permission, order, designation, or prescription, etc., of the ENGINEER is intended; and, simarily, the words, 'Approval,' 'Acceptable,' 'Satisfactory,' or words of like import shall mean approved by or acceptable or satisfactory to the ENGINEER.

"Whenever in the specifications or drawings accompanying this Agreement, the terms or descriptions of various qualities relative to finish, workmanship, or other qualities of similar kind cannot, from their nature, be specifically and clearly described and specified, but are necessarily described in general terms of fulfillment of which must depend on individual judgment, then, in all such cases, any question of the fulfillment of said specifications shall be decided by the ENGINEER, and said work shall be done in accordance with his interpretations of the

meaning of the words, terms or clauses defining the character of the work."

"9. *Lines and Grades*. All lines and grades shall be furnished by the ENGINEER. Whenever necessary, work shall be suspended to permit of this work, but such suspension will be as brief as practicable and the CONTRACTOR shall be allowed no extra compensation therefor. The CONTRACTOR shall give the ENGINEER ample notice of the time and place where lines and grades will be needed. All stakes, marks, etc., shall be carefully preserved by the CONTRACTOR, and in case of careless destruction or removal by him or his employees, such stakes, marks, etc., shall be replaced by the ENGINEER at the CONTRACTOR'S expense."

"10. *Superintendence and Inspection*. It is agreed by the CONTRACTOR that the CITY shall be and is hereby authorized to appoint from time to time such ENGINEERS, superintendents or inspectors as the said CITY may deem proper, to inspect the material furnished and the work done under this Agreement, and to see that the said material is furnished, and said work is done in accordance with the specifications therefor. The CONTRACTOR shall furnish all reasonable aid and assistance required by the ENGINEERS, superintendents or inspectors for the proper inspection and examination of the work and all parts of the same. The CONTRACTOR shall regard and obey the directions and instructions of any ENGINEERS, superintendents or inspectors so appointed, when the same are consistent with the obligations of this Agreement and of the specifications attached hereto, or said CONTRACTOR shall immediately appeal to the ENGINEER for his decision."

"11. *Discrepancies and Omissions*. It is further agreed that it is the intent of this contract that all work must be done and all material must be furnished in accordance with the best practice, and in the event of any discrepancies between the plans and specifications, or otherwise, or in the event of any doubt as to the meaning of any portion of the contract, specifications or plans, the ENGINEER, shall define which is intended to apply to the work."

"18. *Preliminary Approval*. No ENGINEER, superintendent or inspector shall have any power to waive the obligations of this contract for the furnishing by the CONTRACTOR of good material, and of his performing of good work as herein described, and in full accordance with the plans and specifications. No failure or omission of any ENGINEER, superintendent or inspector to condemn any defective work or material shall release the CON-

TRACTOR from the obligations to at once tear out, remove and properly replace the same at any time prior to final acceptance upon the discovery of said defective work, or material; provided, however, that the ENGINEER, his assistant or inspector, shall, upon request of the CONTRACTOR, inspect and accept or reject any material furnished, and in event the material has been once accepted by the ENGINEER, his assistant or inspector, such acceptance shall be binding on the CITY, unless it can be clearly shown that such material does not meet the specifications for this work.

"Any questioned work may be ordered taken up or removed for re-examination, by the ENGINEER, prior to final acceptance, and if found not in accordance with the specifications for said work, all expense of removing, re-examination and replacement shall be borne by the CONRTACTOR, otherwise the expense thus incurred shall be allowed as EXTRA WORK, and shall be paid for by the CITY."

"19. *Defects and Their Remedies.* It is further agreed that if the work or any part thereof, or any material brought on the ground for use in the work or selected for the same, shall be deemed by the ENGINEER as unsuitable or not in conformity with the specifications, the CONTRACTOR shall forthwith remove such material and rebuild or otherwise remedy such work so that it shall be in full accordance with this contract."

"21. *Extension of Time.* If the CONTRACTOR be delayed in the completion of the work by any act or neglect of the CITY or ENGINEER, or of any employee of either, or by other Contractors employed by the CITY, or by changes ordered in the work or by strikes, fires and delays by common carriers, and unavoidable cause or causes beyond the CONTRACTOR'S control or by any cause by which the ENGINEER shall decide justifies the delay, then an extension of time shall be allowed for completing the work, sufficient to compensate for the delay, the amount of the extension to be determined by the ENGINEER; provided, however, that the CONTRACTOR shall give the ENGINEER immediate notice in writing of the cause of such delay."

"22. *Hinderance and Delays.* No charge shall be made by the CONTRACTOR for hindrances or delays from any cause except where the work is stopped by order of the CITY during the progress of any portion of the work embraced in this contract. In case said work shall be stopped by the act of the CITY, then such expense as in the judgment of the ENGINEER is caused by such stopping of said work shall be paid by the CITY to the CONTRACTOR."

"28. *Engineer's Authority and Duty.* It is mutually agreed between the parties to this Agreement that the ENGINEER shall supervise all work included herein and shall in all cases determine the amounts and quantities of the several kinds of material and work, which are to be paid for under this contract. He shall determine all questions in relation to said work and the construction thereof. He shall in all cases decide every question which may arise relative to the execution of this contract on the part of said CONTRACTOR."

"65. *Concrete—Forms.* * * Forms shall not be removed until the Engineer has approved such removal, but the Contractor alone shall be responsible for all injury to concrete due to their premature removal. Forms shall be removed with great care, so as to avoid injury to the concrete. Forms unsatisfactory in any respect shall not be used and if condemned shall be removed immediately from the work."

We copy into this opinion the above portions of the contract to demonstrate that it, in a very comprehensive and certain way, constitutes the engineer, Col. Crecelius, the arbitrator or umpire to consider and decide all questions which might arise during the construction of the project. In this regard we particularly call attention to Subdivision 28, supra, which in no uncertain terms places the supervision of this work under the general control of the engineer, and provides that *"He shall determine all questions in relation to said work, and the construction thereof. He shall in all cases decide every question which may arise relative to the execution of this contract on the part of said* CONTRACTOR."

■ We think the agreements above quoted, and especially Subdivision 28 of the contract, constituted Col. Crecelius, the engineer, the arbitrator or umpire of all questions "which might arise relative to the execution" of the contract between the City and McKenzie. We think, further, that the decisions of such engineer should be accorded the same effect and finality that the law of this State accords to the decisions of arbitrators and umpires agreed on by the interested parties themselves. In our opinon, it would be hard to frame or construct language which would more comprehensively or completely clothe the engineer with the power to finally decide every question which might arise during the construction of this dam by McKenzie than is accomplished by this contract. Under this contract the engineer decided all questions arising relative to the execution of the contract on the part of the contractor. Since both McKenzie and

the City contracted as above indicated, so should they both be bound,—subject, of course to the rules of law which govern such contracts.

When parties to a building contract agree to submit questions which may arise thereunder to the decision of the engineer, his decision is final and conclusive; unless in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment. Galveston, H. & S. A. Ry. Co. v. Henry & Dilley, 65 Texas 685; 4 Tex. Jur., p. 709, sec. 4, and authorities there cited. Under this rule it would be hard to define the exact character or quantum of proof required to show that an umpire or arbitrator has been guilty of fraud, misconduct, or gross mistake. However, it certainly can be said that when an engineer is called on to make a decision under a construction contract such as this his decision cannot be set aside for fraud, misconduct, or gross mistake, simply by proving that some other engineer would have acted differently or given a different decision. Also, we think an engineer's decision under a contract like this cannot be impeached simply on a conflict of evidence as to what he ought to have decided. This must be true, because any other rule would simply leave the matter open for a court or jury to substitute its judgment and discretion for the judgment and discretion of the engineer; and such a procedure or rule would practically nullify the arbitration or umpire agreement. The decision of an engineer or architect under a contract like this is presumed to be correct, and to have been given while acting within the scope of his authority. 4 Tex. Jur., p. 711, sec. 5.

■ Generally speaking, an award of arbitrators upon matters submitted to them is given the same effect as the judgment of a court of last resort. All reasonable presumptions are indulged in favor of the award, and none against it. The courts will not overthrow an award such as this, except in a very clear case. 3 Amer. Jur., p. 958, sec. 135, and authorities there cited.

As to the item of $27,334.69 found as damages by the jury in favor of McKenzie for excess costs or expenses incurred by McKenzie in being required by the engineer to leave concrete forms in place for seven days above elevation 710, the record shows that the jury in response to the several subdivisions of Special Issue No. 40 found:

(a) That the statements and conduct of the engineer at the time McKenzie delivered to such engineer the steel form details,

in evidence, were calculated to reasonably cause McKenzie to believe, in the exercise of ordinary care and in good faith, that the engineer thereby consented to and approved the plan for the removal of said steel forms twice a week on the roadway section of this dam above Elevation 710.

(b) That McKenzie did procure such steel forms, believing in good faith that the engineer had, in effect, consented to and approved their use when being removed twice a week on the roadway section of this dam.

(c) That McKenzie procured the steel forms according to, and as shown on, the blue-print drawing delivered to the engineer.

(d) That the action of the engineer in requiring the steel forms to remain in place seven days was wilful on his part, and that he sought thereby to injure McKenzie and to wrongfully deprive it of its rights under the contract alleged.

(e) That the engineer's requirement that such steel forms be held in place seven days delayed McKenzie in the time of the completion of the dam.

(f) That the requirement of the engineer that McKenzie hold the steel forms in place seven days inflicted upon McKenzie financial damages for excess costs of forms.

(g) That the reasonable damages imposed upon McKenzie for the excess cost of forms above Elevation 710 caused by the requirement of the engineer that the steel forms be held in place seven days, was $27,334.69.

(h) That the refusal of the engineer to allow McKenzie any extension of time by reason of the requirement that the steel forms be held in place seven days, was wilful on the part of such engineer, whereby he sought to injure McKenzie and to wilfully deprive it of its rights under the contract alleged.

In answer to Special Issue No. 41 the jury found that the engineer in October, 1925, did not make and announce a decision authorizing McKenzie to remove the steel forms twice a week.

In answer to Special Issue No. 49 the jury found that the engineer agreed with McKenzie that it might procure a single Blaw-Knox steel form for use in pouring the super structure of this dam, and remove the same twice a week.

As shown by the opinion of the Court of Civil Appeals, at sometime before the work of pouring concrete in the super structure above Elevation 710 had started, McKenzie had under consideration the purchase of steel concrete forms to be used in such work. It appears that McKenzie so informed the engineer, and in doing so stated that it expected to remove such forms

twice a week, or every three and one-half days. It appears that with conditions as above stated, the engineer offered no objections to the purchase of such steel forms, and same were procured by McKenzie at an expense of $13,500.00. It further appears that in pouring the concrete in the super structure above Elevation 710, the engineer required McKenzie to leave the concrete forms in place seven days. McKenzie protested such requirement, and reminded the engineer that it had "followed the recommendation of the Blaw-Know representative in purchasing these forms, and as we submitted the matter to you, and you raised no objection at that time, we naturally assumed that you approved of the method adopted." It further appears that the engineer refused to recede from his seven-day requirement, and McKenzie complied therewith. The steel forms were used in part of the work, but wooden forms were also built and used in most of such construction.

Clearly under this contract the engineer had the right and duty to decide how long the concrete forms above Elevation 710, or, for that matter, any other elevation, should remain in place; and his decision on that matter is not subject to judicial review, unless in making it he was guilty of fraud, misconduct, or such gross mistake as would imply bad faith. To our minds the Court of Civil Appeals was correct in its holding that in this instance this record contains no evidence to sustain a finding of fraud, misconduct, or gross mistake on the part of the engineer. As shown by the opinion of the Court of Civil Appeals, it required about two and one-half days to remove these forms. If they had been removed twice a week, the concrete would have been allowed to set only one day. We think there is no evidence that any authority would uphold the removal of these forms after the concrete had set only one day. Paragraph 65 of the contract specifically provides that: "Forms shall not be removed until the engineer has approved such removal, * * *." This provision of the contract definitely and specifically left it to the decision of the engineer as to how long concrete forms should be left in place. The very best that can be said with reference to the evidence on the question as to how long the concrete forms here involved should have been left in place before removal, is that authorities are not in exact accord on that question; but,—be that matter as it may, the decision of the engineer in this instance is abundantly supported by competent authority. We think that that is all that the law requires. It is shown that our State Highway Department requires concrete forms to remain in place from 7 to 28 days. Mr. Wickline, an eminent bridge engineer of the State Highway Department,

testified that in highway construction, forms under beams are required to remain in place 28 days, except in cold weather a longer time is required. Mr. Morris Levy, a civil engineer, testified that concrete forms should remain in place from 4 to 5 days to from 7 to 12 days, dependent upon the weather. Mr. W. E. Anderson, a civil engineer, graduate of the Engineering School of the University of Virginia, and consulting engineer for the International Water Commission, testified that the general practice was to have concrete forms under beams and cantalevers remain in place for 28 days. It appears that these forms held concrete slabs 30 feet long and several feet thick. Mr. L. M. Adams, a retired Colonel of the United States Army, graduate of the United States Military Academy at West Point, member of the Engineering Corps of the United States Army for 26 years, and now Port Director at Corpus Christi, Texas, testified there was a wide difference of opinion as to how long the concrete forms should remain in place in given instances, but that 14 days would be the right time for concrete beams not longer than 14 feet, and that the same time should be allowed for cantalevers. The time provided for in the building codes of numerous large cities was offered in evidence. These codes showed a requirement of from 3 to 21 days, depending largely on the kind and character of the construction and the weather conditions. We shall not extend this opinion by further detailing the testimony on this issue. We think we have detailed it sufficiently to show that the engineer in this instance was, as a matter of law, called on to exercise his official judgment, and that his decision is well supported by competent authority. Such a decision of an engineer under a contract like this cannot be adjudged fraudulent or grossly erroneous under testimony that merely shows, or tends to show, a difference of opinion among engineers, or that other engineers might have acted differently.

We agree with the following ruling of the Court of Civil Appeals:

"Appellants seem to take the position that the engineer having failed to speak at the time it was made known to him that steel forms were to be used and that their removal twice a week was contemplated, he would be thereafter estopped from making any other requirement than that understood by the contractor at the time. The contract provided that forms could not be removed until approved by the engineer and it became the duty of the engineer to see to it that forms were not prematurely removed. He owed this duty to both the city and the contractor

and he could not estop himself from properly performing this duty."

The City again urges on this appeal that the alleged contract here declared on by McKenzie was never legally entered into by it and McKenzie. We have expressed our views on that question on the former appeals of this case. 131 Texas 474, 115 S. W. (2d) 617. We see no reason to change them now. The contention that the contract was never legally entered into is overruled.

The trial court entered judgment for McKenzie against the City for $82,157.08, with interest thereon at 8 per cent. from February 24, 1927, until paid. The judgment was entered February 1, 1934. As we understand it, the 8 per cent. interest was allowed as from the date of the completion of the contract, and such interest covers all items of recovery awarded McKenzie against the City. As we understand it, the opinion of the Court of Civil Appeals holds that any recovery had by McKenzie against the City for the breach of this contract should bear 8 per cent. interest from the completion of the contract until paid. Such ruling is based on Subdivisions 24, 25, 26, and 27 of the contract. Such Subdivisions are as follows:

"24. *Partial Payments.* On or before the 5th day of each month, the ENGINEER shall prepare a statement showing as completely as practicable, the total value of the work up to and including the last day of the preceding month, said statement shall also include the value of all materials delivered on the ground that are to be fabricated into the work.

"The CITY shall then pay to the CONTRACTOR on or before the 10th day of the current month, the total amount of the ENGINEER'S statement, less 15% of the amount thereof, which 15% shall be retained until final payment; and further less all previous payments; and also less all further sums that may be retained by the CITY under the terms of this Agreement."

"25. *Final Acceptance.* Whenever the work covered by this Agreement shall be duly completed and ready for final inspection, the CONTRACTOR shall so notify the ENGINEER in writing and a formal Certificate of Final Acceptance shall be issued by the ENGINEER within ten (10) days after the CONTRACTOR has fully completed the work and performed his contractural obligations under this Agreement."

"26. *Final Payment.* Upon the issuance of the Certificate of Final Acceptance of the work, the ENGINEER shall proceed to make final measurements and prepare final statement of the

value of all work performed and materials furnished under the terms of this Agreement, and shall certify same to the CITY and the CITY shall pay to the CONTRACTOR on or before the 15th day after the date of the Certificate of Final Acceptance, the balance due the CONTRACTOR under the terms of this Agreement."

"27. *Delayed Payments.* Should the CITY fail to make payment to the CONTRACTOR of the sum named in any partial or final statement when payment is due, or should the ENGINEER fail to issue any statement on or before the date above provided, then the CITY shall pay to the CONTRACTOR, in addition to the sum shown as due by such statement, interest thereon at the rate of eight (8%) per cent per annum from date due as provided in Paragraphs 24 and 26, until fully paid."

■ We confess that the several provisions above quoted are somewhat vague and indefinite when it comes to ascertaining the character of claims that bear 8 per cent. interest per annum. After a careful examination of all of such provisions, and especially Subdivision 27, we have concluded that the 8 per cent. provision of the subdivision last mentioned, when considered in the light of the four subdivisions, cannot be construed as having application to anything except claims that are included in statements or estimates issued by the engineer. It is true that Subdivision 27 refers at one place to the failure of the engineer to issue any statement; but when the thing upon which interest at 8 per cent. is to be paid is defined, it is provided only that it shall be paid on the sums shown to be due "by such statement." In this connection, we call attention to the language, "then the CITY shall pay to the CONTRACTOR, in addition to the sum shown as due by such statement, interest thereon at the rate of eight (8%) per cent per annum from date due as provided in Paragraphs 24 and 26, until fully paid." The interest is payable *"thereon."* "Thereon" refers back to "such statement." "Such statement" undoubtedly refers to the statement of the engineer. In this connection, we refer to the fact that Subdivision 27 provides for "interest thereon at the rate of eight (8%) per cent per annum from date due as provided in Paragraphs 24 and 26, * * *." When we come to examine Paragraphs 24 and 26, we find that they refer exclusively to statements of the engineer. From what we have said it is evident that we hold that the 8 per cent. provision of Subdivision 27 of the contract refers only to sums owed to the City and covered by statements of the engineer.

The trial court allowed a recovery against the City on an item of $1533.01, representing a deduction made by the engineer in favor of the City and against McKenzie, for a loss or wastage of material and empty sacks. As we understand it, the engineer passed on this question, and his decision is final—unless tainted with fraud, misconduct, or gross mistake. The decision having been made by the engineer, it is presumed to be correct, and the burden is on McKenzie to plead and prove every step necessary to set it aside. As already said, proof that would merely support a different conclusion if the matter were open to an original judicial finding of fact is not sufficient.

It appears that the engineer decided that McKenzie had not completed the surface of the dam in accordance with the contract, and estimated that the cost of the completion of such surface would be $3,100.00. As we understand it, McKenzie was allowed to recover this sum in the judgment of the trial court. We think it is sufficient in this opinion to say that on another trial this matter must be governed by the rules we have already announced.

The contract provides for liquidated damages in the sum of $150.00 per day, to be paid by McKenzie to the City for delay in completing this dam. As regards this matter, it is provided that time is the essence of the contract. We understand that the engineer allowed the sum of $18,600.00 for delay on the part of McKenzie in completing the contract. We further understand that this sum was disallowed by the district court. We are not sure what the opinion of the Court of Civil Appeals holds as regards this question. Since the case must be again tried, it is sufficient to say that, as we construe the contract, the engineer had the primary duty of deciding the question; and we have already decided what it takes to overcome his decision. We here pause to note, however, that some of the delay here involved is embraced in the questions pertaining to delay in removing forms above Elevation 710, already discussed and decided.

The application for the writ of error filed by the City contains numerous assignments which we have not discussed directly. As contained in the application, some of these assignments cannot be considered. Also, as shown by the opinion of the Court of Civil Appeals, some of these assignments were not properly presented to the Court of Civil Appeals. At any rate, we feel that we have said enough to generally indicate to the district court how it shall proceed in the trial of this case, if it is again tried.

. The judgment of the Court of Civil Appeals, which reverses the judgment of the district court, is affirmed.

Opinion delivered March 19, 1941.

Rehearing overruled May 14, 1941.