## SUPER–COLD SOUTHWEST CO. v. FIRST BAPTIST CHURCH OF CORSICANA et al.

### No. 2850.

Court of Civil Appeals of Texas. Waco.

March 31, 1949.

Rehearing Denied April 21, 1949.

Malone, Lipscomb & Seay, of Dallas, for appellant.

Tyson, Dawson & Dawson, of Corsicana, for appellees.

LESTER, Chief Justice.

The appellant, Super-Cold Southwest Company and appellee First Baptist Church of Corsicana, in July, 1946, entered into a contract whereby the appellant was to install air-conditioning equipment in the church for the sum of $8500.00. $1700.00 was paid in cash at the time the contract was signed. The equipment was installed by the appellant in August, 1946. A disagreement arose between the parties as to the sufficiency of said equipment. On May 12, 1947, the appellant, appellee and the State National Bank of Corsicana entered into an arbitration contract whereby the appellant was to place with the bank the sum of $1700.00, and the appellee the sum of $6800.00, to be held by said bank in escrow. The condition of the agreement was that upon a test to be made on a Sunday in June, beginning at 11:00 A.M. and continuing until 12:00 noon, with the congregation assembled, said equipment should maintain a 15 degree cooler temperature within the auditorium of the church than that recorded in the shade outside of said church. If appellant complied with this condition the bank should deliver to it the $8500.00, but if it failed to so comply the bank should deliver the money to the ap-

pellee, with the right of the appellant to remove said equipment from the church. After the test the appellant claimed it had in all things complied with its arbitration agreement and was entitled to the escrow money. The appellee contended that appellant had not so complied and claimed it was entitled to the money.

The bank filed in the district court an inter-pleader and tendered into court the $8500.00, and the appellant and appellee, each filed pleadings seeking recovery of said sum. The court discharged the bank and allowed it the sum of $250.00 as attorney's fees; and rendered judgment awarding the balance of the money in the sum of $8250.00 to the appellee, and entered judgment in favor of the appellee against the appellant for the sum of $250.00 representing the sum allowed the bank as its attorney's fee.

The contract in part provided:

"(3) It is contemplated by the parties that in order to comply with the terms of the contract attached as Exhibit 1, the air-conditioning equipment when turned on shall be adjusted so that within a reasonable time it will lower the temperature within the main auditorium and maintain such temperature during 11:00 A.M. and 12:00 noon at a level which runs during such period at least 15 degrees lower in said main auditorium than the running temperature in the shade outside of the church building proper during such period. * * *

"(5) In the event the air-conditioning equipment placed in operating order by Super-Cold Southwest Company does, according to the mean average of said thermometer readings at all times during 11:00 A.M., to 12:00 noon on the day of such test, lower and maintain the temperature within the main auditorium of the church so that for the corresponding time between such 11:00 to 12:00 period there is a difference of at least 15 degrees between the temperature recorded within the church and the outside temperature in the shade, and such minimum 15 degree temperature differential is maintained at the time of the June test during the period of the church services from 11:00 A.M., to 12:00 noon on the day of said June test, then and in that

event the full sum of $8500.00 will be paid by said Bank to Super-Cold Southwest Company forthwith. On the contrary, in the event said temperature is not so lowered and maintained during the June test, said sum of money will be paid by said bank at Corsicana, Texas, to the First Baptist Church, and the Super-Cold Southwest Company shall be given access to the church premises and shall enter and remove its air-conditioning equipment from said premises and restore and replace all ducts and all installations as they presently exist at no expense to said church, and the attached contract shall be considered as rescinded by the parties. It is agreed by the parties that such minimum difference in temperature is to be maintained from 11:00 A.M. to 12:00 noon on the day of the test with the full congregation in the church while all doors, windows and openings are fully closed. It is further understood and agreed that all windows and doors will be kept closed during the preparation of the church for such tests, as well as during the time of the tests under directions of the Super-Cold engineers. Super-Cold may have its engineers present who are to have full control to conduct and supervise the tests, and First Baptist Church may have its engineer present to witness the tests. The church officials and members will extend full cooperation to Super-Cold and its agents and employees at all times in preparing the equipment and the church in making the preliminary tests and the official test."

The date of the test was postponed by mutual agreement until Sunday, July 20, 1947. The appellant's representatives arrived on the 19th, checked the equipment and put it in operation about 4:30 P.M., and continued it in full operation until after 12:00 noon on the 20th, with one of its mechanics present and supervising it. The representatives of the church and their engineer went to the church on the morning of the 20th between 9:00 and 10:00 A.M. and found the thermometers in the auditorium had been placed flat upon the floor, and the one on the outside had been placed across the alley under the eaves and on the north side of the Sunday School building in an aperture between the Sun-

day School building and another building. The walls of this other building were painted white and the direct rays of the sun were shining upon it. The representatives of the church protested to the appellant's representatives against the thermometers on the inside being placed upon the floor and requested that they be raised higher so they would properly record the temperature three or four feet higher than the floor level. They also protested against the location of the thermometer on the outside being right up beneath the eaves of the house and being placed where the heat would be reflected from the wall of the other building and being placed where the air could not circulate, and requested them to place said thermometer in a tree near the church, or on some other building or at some other location in the shade so as to have the benefit of the normal circulation of the air, contending that as the thermometer was then situated it would record a temperature materially higher than the true running shade temperature; that the proposed test was unfair and the church would not be bound by such a test. The representatives of the appellant lowered the outside thermometer some 15 to 24 inches but refused to take it out of the aperture, saying, "That's where it is and that's where it is going to stay."

The court filed findings of fact and conclusions of law. Among some of the facts found by the court are:

"4. That thereafter, by agreement by all parties, the test as aforesaid was made between the hours of eleven and twelve o'clock on Sunday, July 20th, 1947; that preliminary thereto, the air cooling equipment was turned on in the First Baptist Church by Super-Co. at about 4:30 P.M. of July 19, 1947, for testing and for reducing the temperature within the church. That prior to the hours of eleven and twelve o'clock on the day of the test, Super-Cold's representatives placed three thermometers duly calibrated and tested within the auditorium of said church on the floor thereof, said thermometers being placed in a diagonal line across said auditorium beginning at the southeast corner and extending to the northwest corner.

"5. That the outside thermometer, duly calibrated and tested, was placed by Super-Cold in a passageway between two wooden buildings, the passageway being about 43 inches wide; that said thermometer was placed under a projecting eave about 12 inches from the wall of the building south of the passageway and about 31 inches from the wall of the building to the north of said passageway.

"6. That the wall of said house on the north of said passageway was painted white; that the rays of the sun between the hours of 11 and 12 o'clock struck directly a part of said white wall, causing a reflection to the south, and directly upon said outside thermometer; that the temperature at the point where said thermometer was suspended was a minimum of six degrees above, or hotter than the temperature in the shade on the outside of the church building proper at said time.

"7. That, at all material times, the temperature on the floor of the auditorium inside the church was lower and cooler by from 2 to 5 degrees than it was within said auditorium at a point from 3 to 5 feet above said floor.

"8. That the representatives of the church remonstrated with the representatives of Super-Cold with reference to the placing of both the inside and outside thermometers, and objected thereto, and requested their removal to some representative points. That such request was refused; that the placement of the interior thermometers by Super-Cold at the floor level did not secure a true representation of said temperature within said auditorium, and were placed there fraudulently, as a matter of law. That the placement of the outside thermometer at the place stated did not secure a true representation of the running temperature in the shade on the outside of the church building proper and was placed thereat by the representatives of Super-Cold, fraudulently.

"9. That there are certain ambiguities in the contract of May 12, 1947; that one of said ambiguities is the provision dealing with the right to locate or place the thermometer on the outside of the church; that because of said ambiguity the court

admitted parol evidence as bearing thereon and finds that it was the intention of the parties by the use of the language in the contract to have said outside thermometer placed by the agreement of the parties.

"10. That the action of Super-Cold in turning on the air conditioning equipment on Saturday, July 19, 1947, at approximately 4:30 o'clock and leaving the same running continuously until 12:00 o'clock noon of July 20, 1947, was not 'a reasonable time' to lower the temperature within the main auditorium, within the meaning of said contract; that a reasonable time so to do would be from 3 to 6 hours.

"11. That there is evidence in this case that the equipment supplied by. Super-Cold is mechanically incapable of reducing the temperature 15 degrees, as provided for in the contract, and this court so finds.

"12. The court is of the opinion that no test as required by the aforesaid contract was held on July 20, 1947, or at any other time."

Appellant contends that there is no evidence to support such findings. If there is not sufficient evidence to support the court's findings, the appellant is eminently correct in its contention that as a matter of law it is entitled to receive the money placed in escrow, but if such findings have support in the evidence, then its contention must be overruled.

In addition to the facts that have heretofore been shown concerning the manner of the test that was made on the occasion in question, the appellant's witnesses testified the thermometers on the inside were set flat on the floor so they would get the full benefit of the coldest strata of air inside. The representatives of the church secured from the Lone Star Gas Company and the Mid-Coal Company thermometers which were big 14″ instruments made by the Taylor Recording Company. Appellant's witness testified the thermometers made by Taylor Recording Company were the very best and appellee's witnesses testified that these thermometers, on the inside, when placed on the same level and alongside of the appellant's thermometers, recorded the same reading, but when placed about thirty inches higher they recorded a temperature of from three to seven degrees higher than that recorded when setting or lying on the floor. The one placed in the southeast corner was the lowest but the floor at that area was lower than the other portions of the floor of said auditorium. The thermometer placed on the outside in an aperture of forty-three inches wide and suspended beneath the eaves of the Sunday School building and placed in a position where the reflection of the heat, by reason of the sun shining against an opposite white painted wall, would record a higher degree of temperature than would be recorded in the shade on the outside under normal conditions, there being no opening north and south because the buildings came together. The evidence shows that the appellant's thermometer in the aperture recorded a temperature which ranged from 95 degrees to 100 degrees during the test, which was from 6 to 9 degrees higher than the thermometer placed by appellee's representatives in a tree near the church, which recorded an average temperature of 91 degrees. The official government thermometer, which was located a short distance away, recorded a running temperature in the shade from 88 degrees to 91 degrees for the same period of time and the highest for the day was 92 degrees.

Appellant says that the clause in the contract, "Super-Cold may have its engineers present, who are to have full control, to conduct and supervise the test", made it the supreme arbiter of the manner of the test to be made, and that its judgment in the method used was final and binding upon the appellee. But there are well-established exceptions to this rule, and some of them are fraud, misconduct, or such gross mistake as would imply bad faith or failure to exercise an honest judgment upon the part of the arbiter. First State Bank of Tenaha et al. v. Collingsworth, Tex.Civ.App., 111 S.W.2d 309; City of San Antonio et al. v. McKenzie Construction Co., 136 Tex. 315, 150 S.W.2d 989; Galveston, H. & S. A. R. Co. v. Henry & Dilley, 65 Tex. 685; 4 Tex.Jur. p. 709, sec. 4. Appellee pleaded these exceptions and the court found the same to be true. As stipulated in the contract by the parties: "The church is desirous of

having said equipment function in order that the congregation may be comfortable during worship services in the hot summer months, and Super-Cold is desirous of making said equipment function to the satisfaction of the church and in fulfillment of its guarantee to reduce the temperature in the auditorium of said church by as much as 15 degrees, * * *". Regardless of whether the contract is ambiguous or unambiguous, it was incumbent upon appellant to exercise good faith in carrying out the terms of the contract so as to comply with the intention of the parties and to accomplish the purpose for which it was executed, as clearly expressed. The contract does not contain an express provision providing that the appellant should exercise good faith in the method used in making the test. The intention of the parties as disclosed from the entire contract clearly reveals that it was intended that a fair test should be made. The obligation to use good faith in carrying out what is written underlies all written agreements of the character of the one which is now in question. Athough the contract may not expressly so provide, such provision will be implied. 12 Am.Jur. p. 767, sec. 239; Brassil v. Maryland Casualty Co., 210 N. Y. 235, 104 N.E. 622, L.R.A.1915A, 629. Appellee's evidence is that the difference in the recorded temperature between the thermometers that were placed on the inside of the church by the appellee and the one placed in the tree recorded a differential temperature of from five to eight degrees. Appellee's expert witness testified that he inspected the equipment installed in the church; he found the air compressors connected to two different banks of fin type cooling coils; that such coils are not ordinarily used in air-conditioning at all, that they are designed and used for the preservation of food; the kind of coil used in air-conditioning has a large face area presented to the flow of water; that "the air-conditioning area is some eight or ten inches thick and in this system installed in the church are all small instruments two feet long by twelve—something that somebody just racked up there, kinda hung up in the air stream;" that in his opinion three hours would be a reasonable time af-

ter an air-conditioning system is turned on to produce the desired effect and that fifteen to eighteen hours was an unreasonable time; that he considered the system inadequate in that it was only a 20-ton unit and it would take a 50-ton unit to produce the desired effect. One of appellant's expert witnesses and one that helped install the equipment testified that the 20-ton unit as presently installed would not cool the auditorium and in order to get a satisfactory job it would be necessary to re-run the duct work, and he had so told the officials of the company during the time the installations were being made. He also testified that he knew of no air-conditioning unit which had been sold, installed, accepted and paid for that was giving satisfactory service that takes longer than four to six hours from the time the switches are thrown until it produces the desired results.

The trial court had a right to take all these facts into consideration in passing upon the good faith and honest judgment of the appellant in making said test, together with the arbitrary conduct of the appellant, over the protest of appellee, in placing the outside thermometer between the two buildings under the eaves of one of them in an aperture of 43 inches in width, where the air could not circulate north and south, with the sun shining on the wall of one of said buildings, which reflected the heat against the thermometer, creating a temperature varying from 95 to 100 degrees during the period of said test, while the temperature in the shade in the tree recorded an average temperature of 91 degrees and the government thermometer nearby recorded a running temperature in the shade from 88 to 91 degrees, with the maximum for the entire day of 92 degrees. We are of the opinion there is sufficient evidence to support the trial court's findings that the outside thermometer, located as it was, reflected a spirit of bad faith upon the part of the appellant, and that the test was unfair to the appellee and constituted fraud upon the part of appellant. We are also of the opinion that the judgment of the trial court is supported by sufficient evidence that the equipment supplied by the appellant is mechanically incapable of reducing

the temperature 15 degrees within a reasonable time, as provided by the contract.

We have considered all of the appellant's assignments, and finding no error, they are hereby overruled.

The judgment of the trial court is in all things affirmed.