# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2018

Lyle W. Cayce
Clerk

No. 16-20224

JOHN M. O'QUINN, P.C., doing business as O'Quinn & Laminack; JOHN M. O'QUINN & ASSOCIATES, L.L.P., doing business as O'Quinn & Laminack; JOHN M. O'QUINN LAW FIRM, P.L.L.C.; O'QUINN & LAMINACK,

Plaintiffs–Appellants,

v.

LEXINGTON INSURANCE COMPANY,

Defendant–Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before REAVLEY, OWEN, and SOUTHWICK, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

This case arises from a fee dispute about litigation expenses that an arbitration panel found attorneys had improperly allocated to their clients. John M. O'Quinn P.C., doing business under the name of other law firms that included the O'Quinn name (to whom we will refer collectively as "O'Quinn") represented many clients as plaintiffs in litigation against breast implant manufacturers and obtained substantial awards for those clients through settlements. Martha Wood and others were among those plaintiffs, and they subsequently became embroiled in a dispute with O'Quinn regarding the nature and amount of litigation expenses that O'Quinn deducted from the

settlement amounts paid to each plaintiff. The matter proceeded to arbitration, a class was certified by the arbitration panel, and $41,465,950 was awarded to the class (to whom we will refer as the "*Wood* plaintiffs"). A state trial court affirmed the award. O'Quinn appealed but settled with the *Wood* plaintiffs while that appeal was pending, paying them $46,500,000. O'Quinn then sought to recover $15,000,000 of that amount from its primary and excess professional liability insurance carriers. The primary insurer paid its full policy limits of $5,000,000. This appeal concerns the claims against the excess insurer, Lexington Insurance Company (Lexington), for $10,000,000 in policy limits. In a lengthy and thorough opinion, the district court concluded that there was no coverage under the terms of the excess policy. We affirm the district court's judgment.

## I

O'Quinn represented plaintiffs in suits against breast implant manufacturers on a 40% contingency fee basis. The *Wood* plaintiffs, their expert witnesses who testified during the arbitration, and the arbitration panel all agreed that "O'Quinn obtained extraordinary results" for the *Wood* plaintiffs in the breast implant litigation. O'Quinn's contingency fee for representing those plaintiffs, approximately $263.4 million, reflects that success. The *Wood* plaintiffs have never contended that O'Quinn was negligent or committed legal malpractice in the course of the breast implant litigation. They have contended only that certain expenses incurred by O'Quinn should not have been deducted by O'Quinn from their settlement proceeds and that as an additional consequence, the contingency fees paid to O'Quinn were more than 40% of their respective recoveries.

The breast implant cases pursued by O'Quinn were consolidated for pretrial and discovery purposes. O'Quinn deposed expert and other witnesses whose testimony was relevant in each of the *Wood* plaintiffs' cases and

allocated those and a host of other costs and expenses that O'Quinn labeled as Breast Implant General Expenses (BI General Expenses) among all clients by deducting 1.5% from each client's settlement. Some of those clients sued O'Quinn for failing to disclose in writing how it calculated and deducted BI General Expenses from settlement proceeds. Ultimately, the *Wood* plaintiffs asserted and prevailed upon breach-of-contract and breach-of-fiduciary claims against O'Quinn in arbitration proceedings. We consider in more detail below the nature of those claims and the arbitrators' findings and awards.

As noted above, a state trial court affirmed the arbitration award, and more than two years after the arbitrators' decision had issued, while an appeal of the state court's judgment was pending, O'Quinn settled with the *Wood* plaintiffs, paying them $46.5 million. O'Quinn contends that it was motivated to settle because its primary and excess professional liability insurers had refused to provide coverage, and post-judgment interest on the state-court judgment affirming the arbitration award was mounting at $11,000 per day. O'Quinn asserts that $5 million of the $46.5 million of the settlement payment was for post-judgment interest.

While the *Wood* suit remained pending, the primary insurer brought a diversity suit in federal district court seeking a declaratory judgment that it had no duty to defend or indemnify O'Quinn in the *Wood* litigation. O'Quinn counterclaimed seeking a defense from the primary carrier and indemnity from both the primary and excess carriers. The district court ruled that the primary carrier owed a defense and stayed the indemnity issues pending resolution of the *Wood* litigation. After the *Wood* suit was settled, the litigation in federal court between O'Quinn and its insurance carriers resumed. O'Quinn filed a motion for summary judgment arguing that the insurance policies obligated all "Insurance Companies" to indemnify O'Quinn for its "Losses" but in the section of the motion addressing "Defense Costs" named only the primary insurer. The

No. 16-20224

primary and excess insurers filed motions seeking summary judgment in their favor.  Before the district court ruled on any of the motions, O'Quinn settled with its primary carrier, which paid its policy limits of $5,000,000.

The district court denied O'Quinn's motion for summary judgment and granted Lexington's summary judgment motion, determining that Lexington had no duty to indemnify O'Quinn.  The court did not address whether Lexington had a duty to defend.  O'Quinn filed a motion to alter or amend the district court's judgment, arguing that Lexington had also breached a duty to defend.  The district court denied the motion.  O'Quinn appealed the entry of summary judgment and the order denying its motion to alter or amend that judgment.

## II

The parties agree that Texas law governs the excess insurance policy. Under Texas law, if an insurance contract "is worded so that it can be given only one reasonable construction, it will be enforced as written."[1]  "However, if a contract of insurance is susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured."[2]  "The insured bears the initial burden of showing that there is coverage, while the insurer bears the burden of proving the applicability of any exclusions in the policy."[3]

"[T]he duty to defend and the duty to indemnify by an insurer are distinct and separate duties,"[4] and the duty to defend is "broader" than the duty to

---

[1] *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) (citing *Puckett v. U.S. Fire. Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984)).

[2] *Id.*

[3] *Guar. Nat'l Ins. Co. v. Vic Mfg. Co.*, 143 F.3d 192, 193 (5th Cir. 1998).

[4] *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821-22 (Tex. 1997).

indemnify.[5] Under Texas law, the "factual allegations in the pleadings and the policy language determine an insurer's duty to defend,"[6] but "the facts actually established in the underlying suit determine whether the insurer must indemnify its insured."[7] Texas courts "have long held that 'an award of arbitrators upon matters submitted to them is given the same effect as the judgment of a court of last resort.'"[8]

This court "review[s] a grant of summary judgment de novo, applying the same standard as the district court."[9] Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[10] We first consider whether the district court erred in holding that Lexington had no duty to indemnify O'Quinn for any part of the settlement with the *Wood* plaintiffs.

## A

The excess policy "follow[ed] form" to the primary policy, meaning the former incorporated the provisions from the latter. The policy obligates Lexington to indemnify "Loss" arising from certain claims. "Loss" is defined as

> damages, judgments, settlements, and Defense Costs; provided, however, that Loss does not include fines, penalties, sanctions, taxes, punitive or exemplary damages, the multiplied portion of multiplied damages, reimbursement of legal fees, costs, or expenses, any amount for which the Insured is not financially liable or for which is without legal recourse to the Insured, or

---

[5] *Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 490 (Tex. 2008) (citation omitted).

[6] *Trinity Universal*, 945 S.W.2d at 821 (citing *Am. Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 847-48 (Tex. 1994)).

[7] *Zurich Am.*, 268 S.W.3d at 490 (citing *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 310 (Tex. 2006)).

[8] *CVN Grp., Inc. v. Delgado*, 95 S.W.3d 234, 238 (Tex. 2002) (quoting *City of San Antonio v. McKenzie Constr. Co.*, 150 S.W.2d 989, 996 (Tex. 1941)).

[9] *Haverda v. Hays County*, 723 F.3d 586, 591 (5th Cir. 2013) (citing *Vaughn v. Woodforest Bank*, 665 F.3d 632, 635 (5th Cir. 2011)).

[10] *Id.* (quoting Fed. R. Civ. P. 56(a)).

matters which may be deemed uninsurable under the law pursuant to which this policy is construed.

The policy also requires that "Loss" be "for any actual or alleged Wrongful Act" when the act "has been committed by . . . any other person or entity in the rendering or failing to render Professional Legal Services." The policy defines "Professional Legal Services," as pertinent here: "legal services and activities . . . performed as a lawyer . . . [or] Fiduciary." The policy defines "Wrongful Act" to include "an act, error, or omission, including but not limited to breach of contract or duty (including but not limited to Fiduciary duty)."

The arbitration panel found that O'Quinn's fee agreements with each of the *Wood* plaintiffs "do not allow for the deduction of BI General Expenses and that certain of the BI General Expenses charged to Plaintiffs were inappropriate." In the latter category, an attorney with an O'Quinn firm conceded that "charging clients for items such as professional association dues, other lawyer's fees, flowers, fundraising, [and] office overhead" was improper, and that the O'Quinn firms had intended at some point to remove any inappropriate charges such as these. However, at the time of the arbitration, they had not done so. O'Quinn's expert also found additional expenses included in BI General Expenses that should not have been included, and testified that more than $1,000,000 should be removed from BI General Expenses. But more broadly, the arbitration panel concluded that legitimate BI General Expenses could not be deducted from the *Wood* plaintiffs' settlement proceeds because "the Fee Agreements do not allow for the deduction of BI General Expenses," and "O'Quinn's actions were not authorized by the Fee Agreements" for such deductions.

The arbitration panel awarded breach of contract damages to the *Wood* plaintiffs in the amount of $9,979,364 based on the BI General Expenses deductions and the deductions that were not, in fact, BI General Expenses.

The panel also awarded "attorneys' fees on the breach of contract claim" in the amount of $2,494,841, and pre-judgment interest in the amount of $3,991,745 "on the breach of contract damages."

The excess policy's definition of a "Wrongful Act" includes "breach of contract." But the district court held that other of the policy's provisions expressly state that there is no coverage for the type of breach of contract found by the arbitrators. We agree with the district court.

The definition of "Loss" says that "Loss does not include . . . reimbursement of legal fees, costs, or expenses." The arbitration panel concluded that "an appropriate remedy [for the breach of contract] is the return by O'Quinn of all BI General Expenses improperly deducted from the Class Members' settlement distributions." O'Quinn was required to reimburse "costs or expenses" that had been charged to the *Wood* plaintiffs. But even if the policy does not cover reimbursements made by O'Quinn, but instead only applies to reimbursements sought by O'Quinn, the policy language means that O'Quinn could not seek "reimbursement" from its insurer for out-of-pocket costs and expenses incurred in the breast implant litigation that none of the *Wood* plaintiffs were obligated to bear.

Other policy provisions, independent of the "Loss" definition, foreclose O'Quinn's claim that the judgment against it for breach of contract is covered. An exclusion applies that precludes coverage. Exclusion B of the policy "excludes coverage for any Loss in connection with a Claim"

> arising out of, based upon, or attributable to a criminal, fraudulent, malicious (other than malicious prosecution), or dishonest Wrongful Act on the part of any Insured, or the gaining of any profit or advantage to which an Insured was not legally entitled. This exclusion will not apply to Defense Costs incurred in defending any such Claims.

No. 16-20224

The arbitration panel concluded in connection with the breach of contract claim that in deducting BI General Expenses from the *Wood* plaintiffs' settlement proceeds, O'Quinn obtained a gain and a benefit to which it was not legally entitled. As noted, the arbitration panel concluded that "O'Quinn's actions were not authorized by the Fee Agreements," and therefore, O'Quinn was not legally entitled to the advantage of having the *Wood* plaintiffs absorb the cost of the BI General Expenses.

**B**

The arbitration panel additionally found that O'Quinn had breached its fiduciary duty by the actions it took regarding the BI General Expenses. The district court concluded, and we agree, that the definition of "Loss" does not cover the remedy that the arbitration panel imposed as a consequence of the breach of fiduciary duty. The definition of "Loss" says that "Loss does not include fines, penalties, sanctions, . . . [or] reimbursement of legal fees." The arbitration panel's award is either a fine, penalty, sanction, reimbursement of legal fees, or each of these.

The "Loss" that O'Quinn suffered is that it was required to pay back to the *Wood* plaintiffs $25,000,000 of the $263,400,000 in contingency fees it had retained from settlement proceeds in the breast implant litigation. This is either a "reimbursement of legal fees" to the *Wood* plaintiffs, or O'Quinn is seeking reimbursement from the excess carrier for $25,000,000 in legal fees that it incurred in pursuing recoveries from breast implant manufacturers for itself and its clients for which it cannot recover.

The arbitration panel's decision makes clear, in any event, that the $25,000,000 is a penalty or sanction that the panel assessed for O'Quinn's "very serious" misconduct, not damages that O'Quinn was required to pay to the *Wood* plaintiffs. The arbitration panel extensively explained the nature of the remedy that it imposed for the breach of fiduciary duty. The panel cited the

seminal decision of the Supreme Court of Texas regarding an attorney's breach of fiduciary duty and fee forfeiture, which is *Burrow v. Arce*.[11] The panel observed that under this decision, "fee forfeiture is an appropriate remedy when an attorney commits a clear and serious breach of fiduciary duty to his client."

The arbitration panel applied six non-exclusive factors set forth in *Burrow*, among them being the effect of the violation on the lawyer's work. "The panel does not believe that the withholding of BI General Expenses had any effect on the value of the work O'Quinn did for the Class Members. To the contrary, the evidence is that O'Quinn obtained extraordinary results for Plaintiffs." The panel's decision also stated that "[m]oreover, even though not allowed by the Fee Agreements, the expenses charged to the Class Members were exceedingly low compared to what clients would have otherwise been charged, and were, for the most part, used for the benefit of the Class Members."

With regard to another of the *Burrow* factors, the arbitration panel concluded that "[o]ther than loss of the money that was improperly deducted and withheld from them, the Panel heard no evidence that O'Quinn's deduction of BI General expenses resulted in any other threatened or actual harm to the Class Members themselves." Why, then, did the arbitration panel require O'Quinn to forfeit $25 million of its $263.4 million contingency fee?

The panel's answer is that it was necessary in order to send an important message not only to O'Quinn but to attorneys in general and to the public. The panel reasoned that "the central purpose of forfeiture is to protect relationships of trust by discouraging agents' disloyalty. Accordingly, the Panel firmly believes that requiring a partial fee forfeiture in this case is necessary to

---

[11] 997 S.W.2d 229, 241 (Tex. 1999).

encourage and underscore the critical objective of protecting the trust between an attorney and client."

Relatedly, the arbitration panel explained that "[q]uite simply, if O'Quinn is allowed to improperly withhold client funds with impunity, other lawyers may believe that they can do likewise. Such a result would destroy the very integrity of the special and unique relationship that exists between an attorney and client." It could not be clearer that the panel was imposing a "penalty" or "sanction" on O'Quinn. That is not a "Loss" within the meaning of the policy.

## C

O'Quinn asserted at oral argument in our court that the district court erred in its consideration of the arbitration panel's findings and that we should not consider those findings, either. First, O'Quinn argued that the district court improperly indulged factual presumptions in favor of the arbitration award instead of making factual presumptions in favor of O'Quinn, the nonmovant, under the summary judgment standard. Second, O'Quinn argued that the arbitration award should not be considered because the settlement between O'Quinn and the primary insurer vacated the arbitration award. O'Quinn made neither argument in its briefing, giving Lexington no opportunity to respond. Instead, O'Quinn's briefing pursued an entirely different theory by relying extensively on the arbitration award and relying upon language in the award in support of its contentions that Lexington is liable.

An appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on

10

which the appellant relies."[12]   Though we "liberally construe briefs in determining what issues have been presented for appeal,"[13] we cannot find any indication in O'Quinn's briefing that it intended to assail the district court's consideration of the arbitration panel's decision.  As a "[f]ailure to satisfy the requirements of Rule 28 as to a particular issue ordinarily constitutes abandonment of the issue,"[14] we conclude that O'Quinn waived these arguments.

## III

O'Quinn contends that even if Lexington is not obligated under the policy to indemnify O'Quinn, Lexington is liable for "Defense Costs."  O'Quinn seeks coverage for two categories of defense costs: $5 million in post-judgment interest and attorneys' fees, costs, and expenses O'Quinn incurred in defending the *Wood* plaintiffs' claims.  The policy defines "Defense Costs" as

> 1.    reasonable and necessary fees, costs, and expenses incurred by the [Insurer], or incurred by the Insured with the written consent of the [Insurer] . . . resulting from the investigation, adjustment, defense, or appeal of a Claim against any Insured . . . .

> 2.    all costs taxed against an Insured in a Claim defended by the [Insurer] and interest which accrues after the entry of a judgment and before the [Insurer] has tendered or deposited in court, or otherwise, such judgment amount covered by the terms of this policy and for which the insured is legally liable.

Lexington contends that O'Quinn waived its arguments regarding defense costs, but in the interest of brevity, we do not address those issues because, on the merits, O'Quinn is not entitled to recover either post-judgment interest or attorneys' fees under the terms of the excess policy.

---

[12] Fed. R. App. P. 28(a)(8)(A).

[13] *United States v. Miranda*, 248 F.3d 434, 444 (5th Cir. 2001) (citing *SEC v. Recile*, 10 F.3d 1093, 1096 (5th Cir. 1993)).

[14] *Id.* at 443 (citing *United States v. Beaumont*, 972 F.2d 553, 563 (5th Cir. 1992)).

No. 16-20224

## A

With regard to post-judgment interest, the policy defines "Defense Costs" to include

> interest which accrues after the entry of a judgment and before the [Insurer] has tendered or deposited in court, or otherwise, such judgment amount covered by the terms of this policy and for which the insured is legally liable.

O'Quinn contends that, under this definition, the insurer is obligated to pay post-judgment interest even if the insurer is not obligated to indemnify the insured for any of the judgment. O'Quinn cites cases that hold insurers liable for interest on the entire judgment, not just interest on the portion of the judgment for which the insurer is liable.[15] In each case O'Quinn cites, the insurer was liable for at least some portion of the judgment.

We need not decide whether an insurer would owe post-judgment interest, or how much post-judgment interest, if it were liable for only a portion of the judgment because the excess insurer is not liable for any part of the judgment, and the policy expressly contemplates coverage for post-judgment interest only when the insurer is liable for the judgment. The policy specifies that the insurer is liable for interest between the time a judgment is entered and the insured pays "such judgment amount covered by the terms of this policy." Under O'Quinn's reading of the policy, even if the insured is not required to pay any of "such judgment amount covered by the terms of this policy," it is liable virtually in perpetuity for interest on the judgment. This construction of the policy borders on the absurd.

As we have held, Lexington is not liable for any portion of the judgment. It is therefore not liable for any post-judgment interest.

---

[15] *See Safeway Ins. Co. of Ala. v. Amerisure Ins. Co.*, 707 So. 2d 218, 221, 223 (Ala. 1997); *In re Tichota's Estate*, 215 N.W.2d 885, 886-87 (Neb. 1974); *Plasky v. Gulf Ins. Co.*, 335 S.W.2d 581, 582-83 (Tex. 1960).

## B

As to attorneys' fees O'Quinn expended in defending the claims asserted by the *Wood* plaintiffs, Lexington, the excess carrier, had no duty to defend O'Quinn against those claims until the policy limits of the primary policy had been exhausted.  The excess policy provided that "Liability is [sic] to pay under this Policy shall not attach unless and until the Underwriters of the Underlying Policy/ies shall have paid or have admitted liability or have been held liable to pay, the full amount of their indemnity inclusive of costs and expenses."  Texas courts have held that an excess insurer is not obligated to participate in the defense of the insured until the primary policy limits are exhausted.[16]

The primary carrier defended the claims against O'Quinn until O'Quinn settled with the *Wood* plaintiffs.  O'Quinn's expert testified that O'Quinn's costs for defending the *Wood* suit totaled $4,676,058.70.  Accordingly, the defense costs had not exceeded the primary coverage at the time of the *Wood* settlement.  At the time that O'Quinn's defense costs ceased, the primary insurance carrier had not paid the full limits of its policy, had not admitted liability, and had only been held liable by the district court to provide a defense. Lexington's obligation to assume defense obligations or to pay defense costs in excess of the primary policy limits had not been triggered when the *Wood* suit ended.  Additionally, the primary carrier was not obligated to indemnify O'Quinn for the judgment obtained by the *Wood* plaintiffs for the reasons set forth above.  The primary policies limits were not exhausted until the primary carrier settled with O'Quinn and paid its policy limits, long after the *Wood* suit

---

[16] *See, e.g.*, *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 538 (5th Cir. 2002).

had been settled. Accordingly, Lexington, the excess carrier, is not liable for any attorneys' fees as defense costs expended in the *Wood* litigation.

* * *

For the foregoing reasons, the judgment of the district court is AFFIRMED.